Mary BARTLETT, on Behalf of
Josephine Neuman, Appellant,

v.

Otis R. BOWEN, Secretary, Department
of Health and Human Services.

No. 85-5233.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 26, 1986.

Decided March 17, 1987.

As Amended March 17, 1987.

Rehearing En Banc Order of June 8, 1987,
Vacated and Panel Opinion Reinstated
July 31, 1987.

Rehearing and Rehearing En Banc Denied
July 31, 1987.

Stephen J. Del Guidice, Washington, D.C., for appellant.

Ronald S. Robins, Sp. Asst. U.S. Atty., a member of the bar of the Supreme Court of Florida, pro hac vice, by special leave of court, with whom Joseph E. diGenova, U.S. Atty., and Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before EDWARDS and BORK, Circuit Judges, and WRIGHT, Senior Circuit Judge.

Opinion for the Court filed by Circuit Judge EDWARDS and Senior Circuit Judge WRIGHT.

Dissenting opinion filed by Circuit Judge BORK.

HARRY T. EDWARDS, Circuit Judge, and J. SKELLY WRIGHT, Senior Circuit Judge:

Appellant Mary Bartlett, plaintiff below, brought suit in the District Court on behalf of her sister, the deceased Josephine Neuman. She challenged the constitutionality of Part A of the Medicare Act on the ground that its partial bar to payment of benefits burdened the free exercise of her sister's Christian Science faith. The District Court dismissed the complaint for lack

of subject matter jurisdiction because the claim failed to meet the $1,000 amount in controversy required by the Medicare Act for judicial review of benefit decisions. On appeal, appellant argues that the jurisdictional provisions of the Medicare Act do not preclude judicial review of her constitutional claim. In the alternative, she maintains that these provisions deny her due process and equal protection of the law if they do bar review.

Upon careful review of the Medicare Act and its legislative history, and pursuant to the guidance given by the Supreme Court in *Johnson v. Robison*, 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), we find that Congress did not intend to bar judicial review of constitutional challenges to the underlying Act. Because we find that Congress did not intend the provisions to preclude review of appellant's claim, we normally should have no need to reach her constitutional arguments. However, because the dissenting opinion has suggested that Congress may foreclose *all* judicial review of the constitutionality of a federal statute, we have addressed this issue. We believe that there would be a clear violation of due process if Congress did in fact preclude any opportunity for an aggrieved claimant to obtain judicial review of one of its enactments.

## I. BACKGROUND

Josephine Neuman, a Christian Science practitioner, suffered a terminal illness and required skilled nursing care. In Februt-

ary, 1976, she entered Lynn House of the Potomac, a Christian Science facility, where she received such care. In May, 1976, during the same spell of illness, Neuman left Lynn House and entered the Washington Home for Incurables, a non-Christian Science facility, where she remained, except for a week's treatment at Georgetown University Hospital, until her death in July, 1978.

Before she died, Neuman claimed and received $377 in Medicare benefits for the post-hospital extended care provided by Lynn House under Part A of the Medicare Act. *See* 42 U.S.C. § 1395x(y)(1) (1982). After Neuman's death, Mary Bartlett, executrix of Neuman's estate, filed a Medicare claim of $286 for the post-hospital extended care Neuman had received at the Washington Home. The Social Security Administration denied that claim initially and upon reconsideration relying on 42 U.S.C. § 1395x(y)(2)(B) (1982),[1] which bars payment of Part A benefits for extended care in a skilled nursing facility unaffiliated with Christian Science to anyone who has, during the same spell of illness, already received such benefits for extended care in a Christian Science skilled nursing facility. An administrative law judge ("ALJ") upheld the denial on appeal, and the Appeals Council of the Social Security Administration adopted the ALJ's decision as the final decision of the Secretary of Health and Human Services (the "Secretary").

Bartlett does not dispute the Secretary's reading of the Medicare Act's provision.

---

1. 42 U.S.C. § 1395x(y) reads as follows:

(y) Post-hospital extended care in Christian Science skilled nursing facilities

(1) The term "skilled nursing facility" also includes a Christian Science sanatorium operated, or listed and certified, by the First Church of Christ, Scientist, Boston, Massachusetts, but only (except for purposes of subsection (a)(2) of this section) with respect to items and services ordinarily furnished by such an institution to inpatients, and payment may be made with respect to services provided by or in such an institution only to such extent and under such conditions, limitations, and requirements (in addition to or in lieu of the conditions, limitations, and requirements otherwise applicable) as may be provided in regulations.

(2) Notwithstanding any other provision of this subchapter, payment under part A may not be made for services furnished an individual in a skilled nursing facility to which paragraph (1) applies unless such individual elects, in accordance with regulations, for a spell of illness to have such services treated as post-hospital extended care services for purposes of such part; and payment under part A may not be made for post-hospital extended care services—

. . . . .

(B) furnished an individual during such spell of illness in a skilled nursing facility to which paragraph (1) does not apply after such services have been furnished to him during such spell in a skilled nursing facility to which such paragraph applies.

Her claim is that the Medicare Act's bar to payment penalizes Neuman's estate solely on account of Neuman's Christian Science faith in contravention of the free exercise clause of the First Amendment. The then-Secretary recognized that she had no authority to rule on constitutional challenges to the Act,[2] and thus she denied Bartlett's claim without addressing the merits of her constitutional challenge.

Having exhausted her administrative remedies, Bartlett brought this action in the United States District Court for the District of Columbia in February, 1982. She reasserts her claim that the Christian Science provisions of the Medicare Act burden Neuman's right to free exercise of religion under the First Amendment and deny her equal protection of the law under the Fifth Amendment. Bartlett further contends that the provision defining "spell of illness"[3] also violates Neuman's right to equal protection and due process under the Fifth Amendment.

The Secretary moved to dismiss Bartlett's action for lack of subject matter jurisdiction based on two jurisdictional provisions of the Medicare Act, 42 U.S.C. §§ 405(h)[4] and 1395ff(b)(2) (1982).[5] Section 405(h), incorporated from the Social Security Act into the Medicare Act by 42 U.S.C. § 1395ii (1982), denies federal question and mandamus jurisdiction over any claim "arising under" the Medicare Act. Section 1395ff(b)(2) bars "judicial review" of any "determination" of "the amount of benefits under part A" of the Medicare Act that has become a "final decision" of the Secretary, if the "amount in controversy" is less than $1,000. The District Court initially denied the Secretary's motion because "[t]he legislative history [of § 1395ff] is devoid of 'clear and convincing' evidence of a congressional purpose to preclude judicial review of substantial constitutional claims," and noted that "if plaintiff were precluded from all judicial review of her claim in this case, the most serious constitutional questions would be present."[6] The court held in the alternative that it had independent federal question jurisdiction over Bartlett's claim, notwithstanding § 405(h).[7] After *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984), was decided, however, the Secretary renewed the motion to dismiss and the court granted it, finding the Supreme Court's opinion in that case to be conclusive on the jurisdictional issues.[8] On appeal, Bartlett claims that §§ 405(h) and 1395ff(b)(2) do not preclude judicial

---

**2.** *See* Decision of Administrative Law Judge (June 26, 1981) at 5, *reprinted in* Joint Appendix ("J.A.") 15; *see also Weinberger v. Salfi*, 422 U.S. 749, 765, 95 S.Ct. 2457, 2466, 45 L.Ed.2d 522 (1975); *Johnson v. Robison*, 415 U.S. 361, 368, 94 S.Ct. 1160, 1166, 39 L.Ed.2d 389 (1974).

**3.** 42 U.S.C. § 1395x(a) (1982).

**4.** 42 U.S.C. § 405(h) provides:
(h) Finality of Secretary's decision
 The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under sections 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.

**5.** 42 U.S.C. § 1395ff(b) provides:
(b) Appeal by individuals
 (1) Any individual dissatisfied with any determination under subsection (a) of this section as to—

. . . . . .

 (C) the amount of benefits under part A (including a determination where such amount is determined to be zero)
shall be entitled to a hearing thereon by the Secretary to the same extent as is provided in section 405(b) of this title and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title.
 (2) Notwithstanding the provisions of subparagraph (C) of paragraph (1) of this subsection, a hearing shall not be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $100; nor shall judicial review be available to an individual by reason of such subparagraph (C) if the amount in controversy is less than $1,000.

**6.** *Bartlett v. Heckler*, 576 F.Supp. 830, 833 (D.D.C.1983).

**7.** *Id.* at 834 n. 10.

**8.** *Bartlett v. Heckler*, No. 82–0552 (D.D.C. Dec. 21, 1984), *reprinted in* J.A. 57.

review of her claim and that if they do, they violate her rights to equal protection and due process of law.

## II. CONGRESS' INTENT IN §§ 405(h) AND 1395ff(b)(2)

■ We begin with the general "presumption that Congress intends judicial review of administrative action."[9] It is axiomatic that this presumption can be overcome only by "clear and convincing evidence" that Congress intended to restrict access to judicial review.[10] Thus, the party seeking to read a legislative scheme to preclude review bears the burden of demonstrating Congress' intent to do so.[11] This showing must be in accord not only with the words of the statute, but with its legislative history as well.[12]

Courts have applied this "clear and convincing" standard in a particularly rigorous fashion when constitutional rights form the basis of the action over which judicial review is sought. As this court has explained:

> When [a] plaintiff seeks to invoke the aid of the judicial branch on constitutional grounds, the Supreme Court and this court have both indicated that only the clearest evocation of congressional intent to proscribe judicial review of constitutional claims will suffice to overcome the presumption that the Congress would not wish to court the constitutional dangers inherent in denying a forum in which to argue that government action has injured interests that are protected by the Constitution.[13]

Indeed, it has become something of a time-honored tradition for the Supreme Court and lower federal courts to find that Congress did not intend to preclude altogether judicial review of constitutional claims in light of the serious due process concerns that such preclusion would raise.[14] These

**9.** *Bowen v. Michigan Academy of Family Physicians,* — U.S. —, 106 S.Ct. 2133, 2135, 90 L.Ed.2d 623 (1986).

**10.** *See Robison,* 415 U.S. at 373–74, 94 S.Ct. at 1168–69; *Abbott Laboratories v. Gardner,* 387 U.S. 136, 141, 87 S.Ct. 1507, 1511, 18 L.Ed.2d 681 (1967).

**11.** *See Block v. Community Nutrition Inst.,* 467 U.S. 340, 351, 104 S.Ct. 2450, 2456, 81 L.Ed.2d 270 (1984) (precluding party must meet standard by showing Congress' intent to preclude is "fairly discernible" in the legislative scheme). The dissent erroneously reverses this burden, concluding that the judicial review provisions at issue constitute a limited waiver of sovereign immunity that must be construed *narrowly* unless the *plaintiff* can prove otherwise. The dissent even contends that "Congress need not make explicit an intention to bar constitutional challenges." There is absolutely no support for this startling conclusion. The Supreme Court has never held that judicial review provisions should be construed as limited waivers of sovereign immunity; the case cited by the dissent deals not with provisions for judicial review, but with a statute of limitations. *See Bowen v. City of New York,* — U.S. —, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). Indeed, a recent Supreme Court opinion dealing with § 1395ff—the statutory provision at issue in this case and claimed by the dissent to be a limited waiver of sovereign immunity—began its analysis, as we do, with "the strong presumption that Congress intends judicial review of administrative action." *Bowen v. Michigan Academy of Family*

*Physicians,* 106 S.Ct. at 2135. Supreme Court precedent could not be clearer that the burden falls on the government to show clearly and convincingly that Congress meant its judicial review provisions to preclude review of administrative action.

**12.** *See Oestereich v. Selective Serv. Sys.,* 393 U.S. 233, 238, 89 S.Ct. 414, 417, 21 L.Ed.2d 402 (1968) ("Examples are legion where literalness in statutory language is out of harmony either with constitutional requirements or with an Act taken as an organic whole." (citations omitted)); *Ralpho v. Bell,* 569 F.2d 607, 617 (D.C.Cir. 1977) ("Recourse to canons of construction, statutory history and common sense is no less necessary when a statute's terms appear superficially to preclude review than when they are silent on that subject.")

**13.** *Ungar v. Smith,* 667 F.2d 188, 193 (D.C.Cir. 1981).

**14.** *See, e.g., Bowen v. Michigan Academy of Family Physicians,* 106 S.Ct. at 2141 & n. 12; *Robison,* 415 U.S. at 366, 94 S.Ct. at 1165; *Cardenas v. Smith,* 733 F.2d 909, 919 (D.C.Cir. 1984); *Ungar v. Smith,* 667 F.2d at 193.

The dissent finds "dispositive" the Supreme Court's recent opinion in *Commodity Futures Trading Comm'n v. Schor,* — U.S. —, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1985), which has no relevance to the instant case except that it concerns an unrelated situation in which the Court *rejected* an interpretation of a statute offered to

cases recognize and seek to accommodate the venerable line of Supreme Court cases that casts doubt on the constitutionality of congressional preclusion of judicial review of constitutional claims.[15] This foreboding line of Supreme Court cases and the ominous warnings of scholarly commentators have moved modern courts to apply the "clear and convincing" standard to congressional enactments in part to avoid the constitutional morass, as we do here.

 Applying this demanding standard with a careful eye on potential constitutional infirmity, we nonetheless find that Congress *did* intend to preclude *independent* federal jurisdiction over Bartlett's claim by enacting 42 U.S.C. § 405(h) and incorporating it into the Medicare Act in § 1395ii. Section 405(h) proscribes independent federal question or mandamus jurisdiction for any action "to recover on any claim arising under [the Medicare Act]." The Supreme Court's decisions in *Salfi* and *Ringer* clearly establish that a challenge to the constitutionality of the Act is a claim that "arises under" the Act for the purposes of § 405(h). As the Court explained in *Salfi:*

> It would, of course, be fruitless to contend that appellees' claim is one which does not arise under the Constitution, since their constitutional arguments are critical to their complaint. But it is just as fruitless to argue that this action does not also arise under the Social Security Act. For not only is it Social Security

benefits which appellees seek to recover, but it is the Social Security Act which provides both the standing and the substantive basis for the presentation of their constitutional contentions.[16]

The Court reiterated its position in *Ringer*, unwilling to change its construction of § 405(h) for a litigant who had not exhausted his administrative remedies.[17] These two cases make clear that parties aggrieved under the Act must follow the review procedures set out by the Act.[18]

 When we turn to the Act's judicial review provision in § 1395ff, however, we reach a different conclusion regarding congressional intent as to preclusion of judicial review of administrative action. Section 1395ff(b)(1)(C), incorporating by reference section 405(g), provides for judicial review in federal district court of "final decision[s]" of the Secretary as to "the amount of benefits under part A [of the Medicare Act]," but subsection (b)(2) excepts cases in which "the amount in controversy is less than $1,000." When we examine these provisions in light of their legislative purpose, it is simply not clear that Congress meant them to preclude any forum for the litigation of *constitutional challenges to the Act itself.* A common sense construction of these provisions in light of manifest congressional purpose and lurking constitutional infirmity suggests that the District Court has jurisdiction to hear appellant's claim.

avoid constitutional infirmity. In that case, however, the proposed interpretation was manifestly at war with the general purpose underlying the statute, *see id.* 106 S.Ct. at 3254, while we reach exactly the opposite conclusion regarding our interpretation of § 1395ff. *See infra* pp. 700–02.

**15.** *See Califano v. Sanders,* 430 U.S. 99, 109, 97 S.Ct. 980, 986, 51 L.Ed.2d 192 (1977); *Oestereich,* 393 U.S. at 243 n. 6, 89 S.Ct. at 419 n. 6 (Harlan, J., concurring); *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 84, 56 S.Ct. 720, 740, 80 L.Ed. 1033 (1936) (Brandeis, J., concurring); *Crowell v. Benson,* 285 U.S. 22, 60, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932); *Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 330–33, 4 L.Ed. 97 (1816); *see also* M. REDISH, FEDERAL JURISDICTION: TENSIONS IN THE ALLOCATION OF JUDICIAL POWER 7–34 (1980) [hereinafter REDISH] (maintaining that due process limits Congress' power to deny a judicial forum for the litigation

of constitutional claims); Sager, *The Supreme Court, 1980 Term—Foreword: Constitutional Limitations on Congress' Authority to Regulate the Jurisdiction of the Federal Courts,* 95 HARV.L.REV. 17 (1981) (same); Taylor, *Limiting Federal Court Jurisdiction: The Unconstitutionality of Current Legislative Proposals,* 65 JUDICATURE 199 (1981) (same).

**16.** 422 U.S. at 760–61, 95 S.Ct. at 2464.

**17.** *See* 466 U.S. at 619, 104 S.Ct. at 2024.

**18.** The dissent unnecessarily goes to great lengths to demonstrate that the quoted language in *Salfi* requires this result. It is difficult to understand why the dissent bothers with its recitation, considering that we have no problem acknowledging this point. Our disagreement arises not from the construction of § 405(h), but from our conflicting readings of § 1395ff, on which *Salfi* offers no direction.

Congress enacted the administrative exhaustion and dollar amount requirements of § 1395ff, as a unified scheme to protect the federal courts from overload by having *all* statutory questions decided first by the Secretary and by permitting only those *non-trivial* statutory decisions to be passed on to the courts. The legislative history of the Act suggests that the scheme as a whole is meant to make the most of the Secretary's expertise and to preserve the courts from relitigating minor matters.[19]

Recognizing this manifest congressional purpose in its examination of the section's administrative exhaustion requirement, the Supreme Court in *Ringer* carefully distinguished the case where the only issue at stake is the constitutionality of the underlying Act from cases where the disputed question "is peculiarly within the Secretary's competence."[20] The Court realized that deferring to the Secretary's expertise by requiring complete exhaustion of administrative procedures makes no sense when the agency has no authority to rule on the disputed issue. Indeed, even the Secretary has recognized this point in adopting a regulation waiving the statute's administrative exhaustion requirement when the only factor precluding an award of benefits is a statutory provision that the claimant challenges as unconstitutional.[21]

Similarly, the purpose of the amount in controversy provision, which is parallel to that of the exhaustion provision, would not be furthered by its application to constitu-

tional challenges to the Act. These claims are not the "trivial" or "minor matters" from which Congress sought to protect the courts. They are also not appropriately left to the Secretary's expertise, as the Secretary has no authority even to entertain them. They must still be funnelled through the administrative process so that the Secretary may address any matters within his expertise, and possibly obviate the need for judicial review of constitutional claims. But, just as the exhaustion requirement has been read flexibly when the constitutionality of the underlying statutory provision is challenged, we should read the amount in controversy requirement in a similar way.

The appellee and the dissent voice the concern that if we read an exception for constitutional claims into the amount in controversy requirement, as we suggest, we will flood the federal courts with exactly the tide of trivial claims that Congress sought to stem.[22] In other words, the appellee and the dissent fear that many claimants will invent spurious constitutional challenges to the Secretary's decision not to grant benefits in cases worth less than $1,000. This concern, of course, is not implicated by the case before us. Here, the claimant has raised a serious challenge to the constitutionality of the Medicare Act on its face.[23] Therefore, we need not decide here whether Congress meant to foreclose review of claims below $1,000 concerning the statute as applied.[24]

---

**19.** *See Salfi,* 422 U.S. at 765, 95 S.Ct. at 2466 (noting that exhaustion requirements are meant to give the parties and the courts the benefit of the Secretary's "experience and expertise"); 118 Cong.Rec. 33,992 (1972) (statement of Senator Bennett) (noting that the purpose of the judicial review restrictions was to avoid overloading the courts with "trivial" or "quite minor" matters); 111 Cong.Rec. 15,836 (1965) (statement of Senator Kennedy) (noting that the "only explanation" for the judicial review restrictions is "concern over the number of cases that may pile up in the courts").

**20.** 466 U.S. at 618 n. 11, 104 S.Ct. at 2023 n. 11 (distinguishing *Mathews v. Diaz,* 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976)).

**21.** *See* 42 C.F.R. §§ 405.718–405.718e (1985); 20 C.F.R. §§ 404.923–404.928 (1986).

**22.** *See* Brief for Appellee at 25.

**23.** We make no judgment, however, on the merits of the appellant's constitutional challenge to the Medicare Act.

**24.** Such claims might indeed be easier to manufacture than wholesale challenges to the Act itself. However, that is simply not the case before us, and we need not rule on Congress' intent or the constitutionality of such a result.

But the logic of the cases casting doubt on the constitutionality of denying a forum for the litigation of constitutional claims would appear to apply with equal force to claims challenging the statute as applied. *See Ralpho v. Bell,* 569 F.2d at 620 ("[I]f legislation by Congress purporting to prevent judicial review of the constitutionality of its own actions is itself constitu-

We hold merely that challenges to the constitutionality of the Medicare Act itself may be reviewed in federal court consistent with congressional intent as expressed in § 1395ff. This holding will not afford much opportunity for frivolous claims since aggrieved claimants must find a way to connect their claims for benefits to a constitutional infirmity of the Medicare Act itself. Furthermore, the courts would not be powerless to rid themselves of cases raising unmeritorious claims. Under *Hagans v. Lavine,* 415 U.S. 528, 536–37, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974), a court can dismiss for lack of subject matter jurisdiction cases raising immaterial, wholly insubstantial or frivolous claims. Further, as the Court noted in *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 776, 90 L.Ed. 939 (1946), a case that fails to raise substantial claims can be dismissed for failure to state a claim upon which relief may be granted. Thus, many claims can be handled either on the pleadings or by summary judgment.

It is critically important to recall that the Secretary has no authority to rule on a constitutional challenge to the Act that enables him. Therefore, our claimant not only has no *judicial* forum in which to raise her claim, but has no forum *at all.* The $1,000 amount in controversy requirement for judicial review was meant to sort out claims so that courts would be the final arbiter in some cases, while the Secretary's decision would be final in others. It was not intended to deny an arbiter altogether for any class of claims, particularly not constitutional ones. It makes sense as a matter of statutory construction to find that Congress, which was trying to make the most of the Secretary's expertise, surely did not intend *this* result.

Our holding is supported by the Supreme Court's decision in *Robison,* which held that challenges to the constitutionality of the Veterans' Administration Act were re-

viewable despite language of the statute that made "the decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration" unreviewable. The Court found the constitutional claim reviewable because the "decision" at issue was that of Congress in enacting the statute rather than of the Administrator in applying it, and the "question" was under the Constitution rather than a "law administered by the Veterans' Administration." [25] Without discussing the constitutionality of the no-review clause generally, the *Robison* Court simply concluded that it could not and was not meant to bar challenges to the constitutionality of the Act itself.[26] The Court also noted that such challenges "cannot be expected to burden the courts by their volume, nor do they involve technical considerations of Veterans' Administration policy." [27] The instant case is similar to *Robison* in that it involves a constitutional challenge to the underlying statute in a scheme administering federal benefits. As in *Robison,* the Government's construction of the Act would "raise serious constitutional questions;" [28] accordingly, we too, have made a searching inquiry into congressional intent.

Not surprisingly, the dissent takes great pains to disparage *Robison.* It refers to the Supreme Court's explicit uneasiness about the "serious constitutional questions" raised by the dissent's proposed statutory construction variously as a "note [ ]," a "remark," and an "aside." Yet, the Court's unequivocal statement of concern in a case dealing with a benefits statute thought to deny an aggrieved claimant any forum for his constitutional challenge could hardly be more apposite. It seems to us hardly "revolutionary," as the dissent declares, to presume that the Court in *Robison* meant what it said. Moreover, in attempting to dismiss *Robison* as somehow

---

tionally suspect, legislation that frees an administrative agency from judicial scrutiny of its adherence to the dictates of the Constitution must pose grave constitutional questions as well.").

**25.** 415 U.S. at 367, 94 S.Ct. at 1165.

**26.** *Id.* at 373, 94 S.Ct. at 1168.

**27.** *Id.*

**28.** *See* id. at 366, 94 S.Ct. at 1165.

anomalous, the dissent ignores clear precedent in this circuit following *Robison* [29] and pointedly makes no mention of the Supreme Court's very recent reaffirmation of *Robison—using exactly the same language.*[30]

Nor do the decisions in *Salfi* and *Ringer* preclude our holding, as the Secretary suggests. *Salfi* expressly distinguished *Robison*,[31] and *Ringer* involved neither a challenge to the underlying statute nor a situation in which the possibility of judicial review was entirely precluded for the claimant. And neither decision purported to construe § 1395ff of the Medicare Act. We find *Robison* to be our most instructive precedent and conclude, as did the Court in *Robison*, that Congress did not intend to bar judicial review of constitutional challenges to the underlying Act; such claims, whatever their dollar amount, are not minor matters which the Secretary can easily resolve himself.

### III. Constitutional Issues

Even if we had found, as the dissent insists, that Congress *did* intend to preclude judicial review of appellant's claim, our analysis would not end there, because such a conclusion would raise the "serious constitutional questions" that the Court avoided in *Robison*. If we were to credit Congress with an intention to foreclose all judicial review under the Medicare Act, the appellant here would have no judicial forum whatsoever (in either a federal or state court) in which to pursue her constitutional claim. Indeed, because the Secretary has no authority to consider constitutional questions, the appellant would have *no forum at all* for the pursuit of her claims. We would thus be faced with a situation in which Congress has enacted legislation and simultaneously declared that legislation to be immune from any constitutional challenge by the plaintiff.

■ In our view, a statutory provision precluding *all* judicial review of constitutional issues removes from the courts an essential judicial function under our implied constitutional mandate of separation of powers, and deprives an individual of an independent forum for the adjudication of a claim of constitutional right. We have little doubt that such a "limitation on the jurisdiction of *both* state and federal courts to review the constitutionality of federal legislation ... would be [an] unconstitutional" infringement of due process.[32]

Because we have found that Congress did not intend to preclude judicial review in the case before us, we should have no occasion to consider whether it would be constitutional for Congress to enact legislation and preclude the judiciary from hearing challenges to the constitutionality of that legislation. Unfortunately, the dissenting opinion has pursued this issue and we feel constrained to respond because of the great significance of the question.

The dissenting opinion, which purports to avoid the "serious constitutional questions" alluded to in *Robison*, relies on an extraordinary and wholly unprecedented application of the notion of sovereign immunity to uphold the Act's preclusion of all judicial review. We note, first, that the dissent finds no relevant support for the novel proposition that it advances. "Indeed, a survey of congressional limitations on the jurisdiction of the lower federal courts suggests that the Supreme Court will not uphold a statutory infringement of constitutional rights under the guise of a jurisdictional statute ...;"[33] it is equally clear that the Court would not allow such a result under the guise of sovereign immunity.

**29.** *See* note 14 *supra.*

**30.** *See Bowen v. Michigan Academy of Family Physicians*, 106 S.Ct. at 2141 n. 12 (expressing concern about the "serious constitutional question" that might be raised by construing the Social Security Act to deny a judicial forum for constitutional claims arising under Part B of the Medicare program).

**31.** *See* 422 U.S. at 761–62, 95 S.Ct. at 2464–65.

**32.** Redish, *supra* note 15, at 27 (emphasis in original).

**33.** J. Nowak, R. Rotunda & J. Young, Constitutional Law 41 (3d ed. 1986) [hereinafter Nowak].

Second, we note that, in relying on an unprecedented notion of sovereign immunity, the dissent has effectively decided the precise constitutional issue that it claims to have avoided. To say that Congress may, as it sees fit, insist on immunity as a way to foreclose all judicial review on the constitutionality of a congressional enactment, is to decide that there is no infringement of due process. We absolutely disagree with this contention.

Moreover, we note that the dissent's hesitancy to address directly the constitutional issue may well stem from a misunderstanding of what that issue is. The dissent characterizes the limits of Congress' power over federal jurisdiction as a "complex" and "profound" question, citing authorities with a variety of viewpoints. And yet the complexities of the issue arise from the potential problems created if, for example, Congress wished to deny any *federal* forum for a federal claim, leaving only a state forum. It is on *this* problem that the dissent's authorities focus their efforts, asking whether Article III places any limits on Congress' plenary power over federal jurisdiction. The question we ask is whether *due process* places any limits on Congress' power, and we conclude, narrowly and rather uncontroversially, that it does and that these limits are broached when Congress denies *any* forum—federal, state or agency—for the resolution of a federal constitutional claim.

In his renowned "Dialogue," which the dissent cites as supporting its argument, the late Professor Henry M. Hart considered the bearing of sovereign immunity and asserted that "no democratic government can be immune to the claims of justice and legal right.... And where consti-

tutional rights are at stake the courts are properly astute, in construing statutes, to avoid the conclusion that Congress intended to use the privilege of immunity, or of withdrawing jurisdiction, in order to defeat them." [34] Because we believe that this view is so firmly rooted in our constitutional tradition of separation of powers, we cannot ignore the contrary views advanced in the dissenting opinion.

A. *The Due Process Right to Have the Scope of Constitutional Rights Determined By an Independent Judicial Body*

In considering the constitutional issue, it is important to recall that, in the entire history of the United States, the Supreme Court has never once held that Congress may foreclose all judicial review of the constitutionality of a congressional enactment. Quite the contrary, on the few occasions when this issue has been considered, courts have declined to find an intention on the part of Congress to preclude all judicial review of constitutional claims. Less than one year ago, the Supreme Court adopted just such an analysis to conclude that Congress did not intend to bar judicial review of the method by which Medicare Part B awards are computed.[35] The Court recognized the constitutional dangers it averted by its holding, noting that "[o]ur disposition avoids the 'serious constitutional question' that would arise if we construed § 1395ii to deny a judicial forum for constitutional claims arising under Part B of the Medicare program." [36] The Court went on to endorse Professor Gunther's unequivocal conclusion that "all agree that Congress cannot bar all remedies for enforcing federal constitutional rights." [37]

---

**34.** P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, Hart and Wechsler's the Federal Courts and the Federal System 336 (2d ed. 1973) [hereinafter Hart & Wechsler].

**35.** *Bowen v. Michigan Academy of Family Physicians,* —— U.S. ——, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986).

**36.** *Id.* 106 S.Ct. at 2141 n. 12 (citing *Weinberger v. Salfi,* 422 U.S. at 762, 95 S.Ct. at 2465 (citing *Johnson v. Robison,* 415 U.S. 361, 366–67, 94 S.Ct. 1160, 1165, 39 L.Ed.2d 389 (1974); *Yakus*

*v. United States,* 321 U.S. 414, 433–44, 64 S.Ct. 660, 671–77, 88 L.Ed. 834 (1944); *St. Joseph Stock Yards Co. v. United States,* 298 U.S. 38, 84, 56 S.Ct. 720, 740, 80 L.Ed. 1033 (1936) (Brandeis, J., concurring))).

**37.** *Id.* (quoting Gunther, *Congressional Power to Curtail Federal Court Jurisdiction: An Opinionated Guide to the Ongoing Debate,* 36 Stan.L.Rev. 895, 921 n. 113 (1984)). Other scholars have also agreed with Professor Gunther. *See* Redish, *supra* note 15, at 25 ("Courts have long recognized a due process right to have the scope of

Under our constitutional scheme, there are admittedly some difficult questions concerning Congress' Article III power to limit federal court jurisdiction.[38] However, most scholars agree that "under the due process clause of the fifth amendment Congress may not exercise Article III power over the jurisdiction of the [federal] courts in order to deprive a party of a right created by the Constitution."[39] Professor Hart, on the other hand, while not disagreeing with this proposition, has suggested that Congress might be free to limit federal court jurisdiction so long as some alternative forum was available:

It's hard, for me at least, to read into Article III any guarantee to a civil litigant of a hearing in a federal constitutional court (outside the original jurisdiction of the Supreme Court), if Congress chooses to provide some alternative procedure. The alternative procedure may be unconstitutional. But, if so, it seems to me it must be because of some other constitutional provision, such as the due process clause.

On the other hand, if Congress directs an Article III court to decide a case, I can easily read into Article III a limitation on the power of Congress to tell the court *how* to decide it.[40]

The courts, too, have recognized a principle that the constitutional guarantee of an independent judiciary limits the legislature in the exercise of its power to regulate court jurisdiction. For example, in *United States v. Klein*, 80 U.S. (13 Wall.) 128, 20 L.Ed. 519 (1872), the plaintiff sued in the Court of Claims under a statute allowing the recovery of land lost or abandoned during the Civil War if the claimant could prove that he had not given aid to the rebellion. Klein won his case in the Court of Claims on a showing that he had re-

ceived a presidential pardon. However, while appeal to the Supreme Court was pending, Congress passed a law providing, in part, that, on proof of pardon, a court should summarily dismiss a claim under the statute for want of jurisdiction. The Supreme Court held the statute unconstitutional. Chief Justice Chase's opinion in *Klein* observes that, in its attempt to limit the jurisdiction of the Court, "[w]e must think that Congress has inadvertently passed the limit which separates the legislative from the judicial power."[41]

As one commentator has noted, "It was clear to the *Klein* Court that Congress could not manipulate jurisdiction to secure unconstitutional ends."[42] *Klein* is particularly relevant to our inquiry because it arguably involved the question of whether the government had waived its immunity to suit. Nonetheless the Court held that Congress could not unconstitutionally limit jurisdiction.

Another example of constitutional limitations on congressional power over the jurisdiction of the courts is *Battaglia v. General Motors*, 169 F.2d 254 (2d Cir.1948). In the mid–1940s, the Supreme Court ruled that certain incidental activities by workers were compensable under the Fair Labor Standards Act of 1938. Congress thereafter passed the Portal-to-Portal Act of 1947, 29 U.S.C. §§ 251–262 (1982), amending the statute to make the disputed work noncompensable and withdrawing the jurisdiction of the courts to hear cases under the old statute. The court in *Battaglia* held that the statutory amendment did not constitute an unconstitutional taking of property because the claimants had no vested rights to overtime pay under the old statute. However, what is noteworthy about *Battaglia* is that, "[b]y considering and rejecting [the plaintiffs'] constitutional

constitutional rights determined by an independent judicial body." (footnote omitted)); No-WAK, *supra* note 33, at 40–41.

**38.** *See* note 37 *supra*. *See also* L.TRIBE, AMERICAN CONSTITUTIONAL LAW 33–47 (1978); C. WRIGHT, LAW OF FEDERAL COURTS 32–39 (4th ed. 1983).

**39.** *See, e.g.,* NOWAK, *supra* note 33, at 41 (footnote omitted).

**40.** HART & WECHSLER, *supra* note 34, at 337 (emphasis in original).

**41.** 80 U.S. (13 Wall.) at 147.

**42.** Sager, *supra* note 15, at 71.

claim, [the] court of appeals explicitly recognized that congressional power over the jurisdiction of the courts is limited by the due process clause."[43] The court thus considered both the constitutionality of the jurisdictional provision and the merits of plaintiffs' underlying claim. As the court noted, "regardless of whether [the deprivation of jurisdiction] had an independent end in itself, if one of its effects would be to deprive the appellant of property without due process or just compensation, it would be invalid."[44]

■ The foregoing cases and authorities suggest that, "to the extent that the provisions of Article III are inconsistent with the due process clause of the fifth amendment, those provisions of Article III must be considered modified by the amendment."[45] This proposition is admittedly controversial insofar as it suggests that there must be some *federal* judicial forum for the enforcement of federal constitutional rights.[46] However, "[s]ince restrictions on federal courts ordinarily leave state courts as available forums, curtailments of federal jurisdiction do not typically require confrontation of the difficult and unsettled problem of access to *some* judicial forum."[47] In other words, courts and legal scholars routinely assume that there is a due process right to have the scope of constitutional rights determined by some independent judicial body—and the Supreme Court has never held or hinted otherwise. On the contrary, although it is undisputed that Congress has some leeway to affect the jurisdiction of the lower federal courts,[48] Congress may not deny to a person attacking a statute "the independent judgment of a court on the ultimate question of constitutionality." *St. Joseph Stock Yards Co. v. United States*, 298 U.S. at 84, 56 S.Ct. at 740 (Brandeis, J., concurring).

■ Although there is no definitive answer to the question whether there are constitutional restraints when Congress seeks to limit the jurisdiction of all *federal* courts, we need not address that question here. This arguably hard question is not posed in a case such as this one where Congress has effectively foreclosed *all* judicial review of Bartlett's constitutional claim under the Medicare Act. We think it obvious that a statute that would have the effect of precluding any sort of review in an independent judicial forum ignores the warnings in *Robison* and fails the test in *Battaglia*. We also believe that such a congressional enactment would be flatly inconsistent with the doctrine of separation of powers implicit in our constitutional scheme.

■ Since *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), the Supreme Court has interpreted the Constitution to give to the judiciary an important, albeit limited, role in the structure of the government. First, federal courts fulfill their role *only* by adjudicating cases or

**43.** Nowak, *supra* note 33, at 43.

**44.** 169 F.2d at 257 (footnote omitted).

**45.** Redish, *supra* note 15, at 25. As to congressional limits on the jurisdiction of the Supreme Court, Professor Ratner has argued that:

It is reasonable to conclude, therefore, that the [Constitutional] Convention gave Congress authority to specify ... orderly procedures and to modify the jurisdiction from time to time in response to prevailing social and political requirements, within the limits imposed by the Court's essential constitutional role. It is not reasonable to conclude that the Convention gave Congress the power to destroy that role. Reasonably interpreted the clause means "With such exceptions and under such regulations as Congress may make, not inconsistent with the essential functions of the Supreme Court under this Constitution."
Ratner, *Congressional Power Over the Appellate Jurisdiction of the Supreme Court*, 109 U.Pa.L. Rev. 157, 171–72 (1960) (footnote omitted).

**46.** *See generally* Gunther, *Congressional Power to Curtail Federal Jurisdiction: An Opinionated Guide to the Ongoing Debate*, 26 Stan.L.Rev. 895 (1984). *See also* discussion and citation of authorities in W. Lockhart, Y. Kamisar & J. Choper, Constitutional Law 57–61 (5th ed. 1980).

**47.** G. Gunther, Constitutional Law 51 n. 6 (11th ed. 1985) (emphasis in original).

**48.** *See Sheldon v. Sill*, 49 U.S. (8 How.) 440, 12 L.Ed. 1147 (1850).

controversies before them.[49] Second, when faced with a proper case or controversy, courts, both state and federal, must apply all applicable laws in rendering their decisions.[50] Third, courts have a duty to uphold the Constitution.[51] Fourth, a law contrary to the Constitution may not be enforced.[52] Last, a final judgment by a court is binding and must be enforced.[53] So, once a case or controversy reaches the courts, the courts, in essence, become the final arbiters as to the constitutionality of government actions.[54]

The delicate balance implicit in the doctrine of separation of powers would be destroyed if Congress were allowed not only to legislate, but also to judge the constitutionality of its own actions. We have no doubt that Congress may and, indeed, should, consider the constitutionality of any legislation that it passes. Moreover, we recognize that the courts may occasionally defer to the judgment of Congress with respect to the constitutionality of certain legislation. Further, the courts arguably may, in their discretion, elect to avoid certain "political" questions that appear to be better left for resolution in the legislative or executive branch. However, it is quite another matter to suggest that Congress may, as it sees fit, act to bar all courts from considering the constitutionality of a legislative act. If Congress attempts to go this far, it has "passed the limit which separates the legislative from the judicial power."[55] The Supreme Court has never upheld such an enactment, and we will not do so here.

It should be emphasized that this case involves a statute enacted by Congress that appellant claims infringes her right to the free exercise of religion. Congress has given appellant a right to benefits that seemingly varies depending upon whether or not she uses a Christian Science facility. This is a potentially serious infringement of appellant's free exercise of her religion. Whether Congress can impose such a statutory restriction is a question for the judiciary. It makes absolutely no sense to us, under any meaningful system of separation of powers, to allow the legislative branch to pass such a law and then avoid judicial review of a broad category of constitutional challenges by individuals injured by the law. We suspect that the dissent recognizes the folly of such a view; this may explain why the dissenting opinion seeks to rest not on a direct analysis of the constitutionality of the statute but on an absolutely unprecedented use of sovereign immunity.

## B. Sovereign Immunity

 In order to avoid the obvious constitutional difficulties that might be posed with a finding that Congress has foreclosed all judicial review, the dissent seeks solace in a novel concept of sovereign immunity. It would be pointless for us to attempt to parse the limits of the dissent's thesis—all that need be understood is that, insofar as the dissent's thesis purports to claim that Congress may foreclose *all* judicial review of the constitutionality of a legislative enactment, it finds no support in the case law of the Supreme Court.

---

**49.** This embraces the requirement that the court have subject matter jurisdiction, *see Capron v. Van Noorden,* 6 U.S. (2 Cranch) 126, 2 L.Ed. 229 (1804), and that a justiciable case or controversy is presented. *See, e.g., Allen v. Wright,* 468 U.S. 737, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (standing); *Hall v. Beals,* 396 U.S. 45, 90 S.Ct. 200, 24 L.Ed.2d 214 (1969) (mootness); *Toilet Goods Ass'n v. Gardner,* 387 U.S. 158, 87 S.Ct. 1520, 18 L.Ed.2d 697 (1967) (ripeness); *Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962) (political questions).

**50.** *Testa v. Katt,* 330 U.S. 386, 67 S.Ct. 810, 91 L.Ed. 967 (1947); *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

**51.** *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). *See also Martin v. Hunter's Lessee,* 14 U.S. (1 Wheat.) 304, 330–33, 4 L.Ed. 97 (1816).

**52.** *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803).

**53.** *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

**54.** *United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974); *Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958).

**55.** *United States v. Klein,* 80 U.S. at 147.

The dissenting opinion, somewhat curiously, seeks to rely on *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed. 1434 (1934), to extract a theory of preclusion based on sovereign immunity. But a careful reading of *Lynch* makes it plain that Justice Brandeis not only did not rely on a finding of sovereign immunity but, on the contrary, engaged in artful interpretation of legislative intent to avoid a conclusion that Congress had invoked immunity to shield its actions from judicial review. He found that "in repealing 'all laws granting or pertaining to yearly renewable term insurance' Congress aimed at the right [and not] at the remedy," 292 U.S. at 583, 54 S.Ct. at 845, and so a suit challenging the constitutionality of the enactment was not barred by sovereign immunity. Justice Brandeis appeared to have been concerned with precisely the problem we face here and that the Court confronted in *Robison*:

> There is a suggestion that although, in repealing all laws "granting or pertaining to yearly renewable term insurance," Congress intended to take away the contractual right, it also intended to take away the remedy; that since it had power to take away the remedy, the statute should be given effect to that extent, even if void insofar as it purported to take away the contractual right. The suggestion is at war with settled rules of construction. It is true that a statute bad in part is not necessarily void in its entirety. A provision within the legislative power may be allowed to stand if it is separable from the bad. But no provision however unobjectionable in itself, can stand unless it appears both that, standing alone, the provision can be given legal effect and that the legislature intended the unobjectionable provision to stand in case other provisions held bad should fall. *Dorchy v. Kansas*, 264 U.S. 286, 288, 290 [44 S.Ct. 323, 324, 68 L.Ed. 686]. Here, both those essentials are absent. There is no separate provision in § 17 dealing with the remedy; and it does not appear that Congress wished to deny the remedy if the repeal of the contractual right was held void under the Fifth Amendment.

> War Risk Insurance and the war gratuities were enjoyed, in the main, by the same classes of persons; and were administered by the same governmental agency. In respect of both, Congress had theretofore expressed its benevolent purpose perhaps more generously than would have been warranted in 1933 by the financial condition of the Nation. When it became advisable to reduce the Nation's existing expenditures, the two classes of benovolences were associated in the minds of the legislators; and it was natural that they should have wished to subject both to the same treatment. But it is not to be assumed that Congress would have resorted to the device of withdrawing the legal remedy from beneficiaries of outstanding yearly renewable term policies if it had realized that these had contractual rights. It is, at least, as probable that Congress overlooked the fundamental difference in legal incidents between the two classes of benevolences dealt with in § 17 as that it wished to evade payment of the Nation's legal obligations.

*Id.* at 586–87, 54 S.Ct. at 846–47. Thus, when the smoke clears in *Lynch*, the sovereign immunity claim fails because to hold otherwise would be to create the possibility that Congress could act unconstitutionally and then attempt to shield its action from review by virtue of sovereign immunity.

Similarly, in *Robison*, the Court used the "'cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the [constitutional] question[s] may be avoided.'" 415 U.S. at 367, 94 S.Ct. at 1165, *quoting United States v. Thirty-Seven Photographs*, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971). Certainly, absent rather explicit congressional intent to use sovereign immunity in this case as a shield to bar judicial review, we ought not conclude that Congress has attempted to rely on sovereign immunity. As in *Lynch*, "[i]t is, at least, as probable that Congress overlooked [the possibility of claims under $1000 raising constitutional

issues] as that it wished to evade [review]." 292 U.S. at 587, 54 S.Ct. at 847.

The dissent also tries in vain to rely on *Maricopa County v. Valley National Bank of Phoenix,* 318 U.S. 357, 63 S.Ct. 587, 87 L.Ed. 834 (1943). *Maricopa County* involved the power of Congress to withdraw the state's power to tax ·federally chartered banks. In response to the claim that this violated the Fifth Amendment, the Court merely answered "no." It decided the constitutional issue on the merits and any references to the sovereign immunity issue are plainly dicta.

Thus, neither *Lynch* nor *Maricopa County* can be read to support a view that Congress may preclude *all* judicial review of claims relating to the constitutionality of a federal statute. The relevant point is that, in *Lynch,* the Court engaged in creative statutory interpretation to *avoid* relying on sovereign immunity. In *Maricopa County,* the Court again did not rely on sovereign immunity when it decided the case on the merits. In fact, the Supreme Court has rarely adverted to sovereign immunity in the past few decades, and the dissent's sources of authority tend to be both old and infrequently cited. Instead, the Court has taken pains to construe Congress' intent to avoid the result endorsed by the dissent. The Court has, in fact, done precisely what Professor Hart suggested courts should do: "[W]here constitutional rights are at stake the courts are properly astute, in construing statutes, to avoid the conclusion that Congress intended to use the privilege of immunity, or of withdrawing jurisdiction, in order to defeat them." [56] Indeed, in support of this proposition, Professor Hart cites the *Lynch*

case,[57] *i.e.,* the same case on which the dissent seeks to rely to support its unprecedented application of sovereign immunity. The dissent's view obviously rejects the "properly astute" analysis of Professor Hart, but it is virtually alone in its maverick assertions regarding sovereign immunity.

Nor are the other cases cited by the dissent persuasive. The dissent cites a string of authorities unrelated to each other or to the instant case in an effort to demonstrate that the bar of sovereign immunity is not automatically defeated by the assertion of a constitutional claim. The dissent claims that the majority opinion requires the doctrine of sovereign immunity to disappear in all litigation against the Government where a constitutional challenge is made. But the dissent has set up a straw man here, as that is not our contention. Ours is the much narrower claim that sovereign immunity may not be invoked when its effect is to preclude *any* judicial review of a challenge to the constitutionality of congressional legislation.

The dissent later focuses on this narrower claim and argues that the Supreme Court *has* upheld such an invocation of the doctrine. The *only* case the dissent could find to support its assertion is *Morrison v. Work,* 266 U.S. 481, 45 S.Ct. 149, 69 L.Ed. 394 (1925).[58] Not only is the case over sixty years old and dispositive of Indian land claims over which Congress has special plenary authority, but its holding has been called into question by later developments in the doctrine of sovereign immunity. Morrison's claim that federal officials were violating his rights to Indian land by

---

**56.** HART & WECHSLER, *supra* note 34, at 336.

**57.** *Id.*

**58.** All of the other cases described at great length in the dissenting opinion deal either with *state* sovereign immunity or *executive branch* immunity, which we treat in turn below. Indeed, many of the cases cited by the dissent purportedly to show that Congress *has* denied any forum at all for constitutional claims are flagrantly mischaracterized. For example, the dissent cites *Mine Safety Appliances Co. v. Forrestal,* 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140 (1945), but in that case, the plaintiff *had* a

forum—the Tax Court—in which to pursue its constitutional claim. Similarly, the dissent relies on *United States v. Mottaz,* —— U.S. ——, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986), in which the plaintiff *also* had a judicial forum in which to pursue his constitutional claim, but failed to do so within the statutory limitations period. These misreadings make it misleadingly easy for the dissent to conclude that the Court did not concern itself with the availability of a judicial forum, because in these cases, unlike the instant case, a hearing was clearly available in some court at some time.

acting under unconstitutional federal statutes was held barred by sovereign immunity because the suit, although against government officials, was, in effect, a suit against the United States involving the disposition of United States land. The holding was later described by the Supreme Court as part of a line of "conflicting precedents" resolved by the Court's decision in *Larson v. Domestic & Foreign Corp.*, 337 U.S. 682, 69 S.Ct. 1457, 93 L.Ed. 1628 (1949).[59] In *Larson*, the Court approved, albeit in limited fashion, the competing line of precedent from *United States v. Lee*, 106 U.S. (16 Otto) 196, 27 L.Ed. 171 (1882), recognizing a "constitutional exception to the doctrine of sovereign immunity."[60] This exception defeats the bar when there is a claim that federal officials have acted in contravention of the Constitution. In such cases, the claim is held to run against the officials rather than against the United States.[61] The Court in *Malone* explained that the *Larson* and *Lee* decisions were guided by the concern that there be *some* remedy for the vindication of the plaintiffs' constitutional claims.[62] It distinguished the situation before it in *Malone* from *Larson* and *Lee*, noting that the plaintiffs in *Malone* always had a forum (the Court of Claims) in which to press their claims.[63] Thus, the dissent's invocation of the cursory discussion of sovereign immunity in *Morrison*, without reference to the implications of sixty years of later developments, is of dubious precedential value. The dissent has found *no* other cases in which an act of Congress was purportedly immunized from judicial review on the basis of sovereign immunity.

 The dissent attempts to support its position by analogy to *state* sovereign immunity doctrine. In doing so, it ignores the fact that the Eleventh Amendment deals only with federal *jurisdiction* to hear

suits against the states, *not* with the states' immunity from suit in any forum. In many Eleventh Amendment cases, the state courts are available to hear the claims raised; only the availability of a federal forum is at issue. Moreover, the dissent conveniently ignores the doctrine of *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), which mitigated the potential harshness of the Eleventh Amendment bar by permitting state officials to be sued for injunctive relief on federal claims in federal court. Thus, *Ex Parte Young* prevents the Eleventh Amendment from denying any forum for constitutional claims. Prospective relief is always available in federal court. Indeed, the doctrine of *Ex Parte Young* has been invoked to protect plaintiffs' rights to receive public benefits.[64] It is plain that the Eleventh Amendment offers little analogous support for the dissent's contentions.

Finally, the dissent cites several cases holding suits for damages against the United States for the unconstitutional actions of executive officials barred by sovereign immunity. These cases offer no support for the contention that sovereign immunity likewise immunizes the legislative branch from judicial review. While we concede that the sovereign may not be sued for damages without its consent, that immunity does not also entail that courts may not review legislative enactments without Congress' consent. Judicial review has been with us since *Marbury v. Madison*, and no one has ever before suggested that it is discretionary on Congress' part. The dissent has conflated the sovereign's immunity from suit for damages with its purported ability to immunize its enactments from judicial review. The only people who have standing to challenge the Medicare provisions at issue in this case are those with claims for benefits. This posture cannot eliminate the availability of judicial review

**59.** *See Malone v. Bowdoin,* 369 U.S. 643, 82 S.Ct. 980, 8 L.Ed.2d 168 (1962).

**60.** *Larson,* 337 U.S. at 696, 69 S.Ct. at 1464.

**61.** *Id.* at 701–02, 69 S.Ct. at 1467.

**62.** *See* 369 U.S. at 647, 82 S.Ct. at 983.

**63.** *Id.* at 647 n. 8, 82 S.Ct. at 983 n. 8.

**64.** *See, e.g., Graham v. Richardson,* 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971) (state welfare officials prohibited from denying benefits to otherwise qualified residents who were aliens).

without also violating the claimants' right to due process of law and raising serious concerns about separation of powers.

This is exactly the point made in *Robison*, and thus the dissent's last attempt to support its position also fails. The dissent maintains that even if due process might require a forum for a constitutional claim when the Government is acting *coercively*, it requires no such forum when the Government has merely denied a claimant *benefits*. But *Robison*, in which the Supreme Court expressed its concern about "serious constitutional questions," was itself a benefits case—a fact that makes hash out of the dissent's much belabored distinction.

The dissent's sovereign immunity theory in effect concludes that the doctrine of sovereign immunity trumps every other aspect of the Constitution. According to the dissent, neither the delicate balance of power struck by the framers among the three branches of government nor the constitutional guarantee of due process limits the Government's assertion of immunity. Such an extreme position simply cannot be maintained. If we follow the reasoning of the dissent to its logical conclusion, Congress would have the power to enact, for example, a welfare law authorizing benefits to be available to white claimants only and to immunize that enactment from judicial scrutiny by including a provision precluding judicial review of benefits claims. We have difficulty understanding how such a law could ever be thought to be beyond judicial scrutiny because of sovereign immunity. To preclude judicial review in such a situation would be just as unconstitutional as the underlying governmental action. Any theory that would allow such a statute to stand untouched by the judicial branch flagrantly ignores the concept of separation of powers and the guarantee of due process. We see no evidence that *any* court, including the Supreme Court, would subscribe to the dissent's theory in such a case.

## IV. CONCLUSION

For the reasons noted above, we find that Congress did not intend to preclude judicial review of the claim before us. The decision of the District Court is thus hereby reversed and remanded.

*So Ordered.*

BORK, Circuit Judge, dissenting:

Appellant Mary Bartlett sued, on behalf of the estate of her deceased sister, Josephine Neuman, to recover $286 in Medicare benefits that the Secretary of the Department of Health and Human Services had denied as reimbursement. The Medicare Act requires the Secretary to deny her reimbursement because of previously reimbursed costs of nursing care in a Christian Science facility. Bartlett maintained below that this statutory provision is unconstitutional, violative of the first amendment's guarantee of the free exercise of religion and the equal protection component of the fifth amendment's guarantee of due process. These contentions are not before us.

The district court dismissed Bartlett's complaint for lack of subject matter jurisdiction because the Medicare Act denies judicial review of the Secretary's decision in any case where the amount claimed is less than $1000. It is this jurisdictional issue that we must decide. Appellant contends that the statute should be read not to deny jurisdiction and, that if it is so read, the bar of judicial review is unconstitutional. The majority agrees with both of those positions. I agree with neither. My conclusion rests upon Supreme Court precedents, which, it must be said, are not free of ambiguity, at least as to the constitutional issue. Since the issue is important in litigation about social insurance benefits programs, it is to be hoped that the Court will soon revisit and clarify this area of law.

## I.

To interpret the statute before us as not intended to cut off judicial review of all claims under $1000 is to deform the statutory text and the Supreme Court precedent as well as to bury prematurely the law of sovereign immunity.

## A.

Before discussing the specific terms of the statutory provisions it will be useful to place them in their legal context. The provisions in question allow claimants access to the courts for some claims but not for others. It is easily shown that the allowance of judicial review is a waiver of sovereign immunity and that the disallowance of such review is an assertion of sovereign immunity. The Supreme Court stated in *Bowen v. City of New York,* —— U.S. ——, 106 S.Ct. 2022, 2029, 90 L.Ed.2d 462 (1986), a case in which constitutional as well as statutory challenges were advanced, that 42 U.S.C. § 405(g), which permits judicial review of the Secretary's decisions on Social Security disability benefits, is a waiver of sovereign immunity so that the provision's statute of limitations is a condition on that waiver and, as such, must be strictly construed.

The Social Security and Medicare benefits programs are not only close parallels but are statutorily integrated. Thus, as will be seen, the Court's statement in *Bowen v. City of New York* shows that we are faced with an assertion of sovereign immunity in this case. Section 405(g) of Title 42 is, as the Court said, a waiver of sovereign immunity.[1] Section 405(h) states that there shall be no judicial review of any decision of the Secretary "except as herein provided."[2] If section 405(g) is a waiver of sovereign immunity, it is impossible to read section 405(h) as anything other than an assertion of such immunity with stated exceptions. Section 405(h) is incorporated into the Medicare Act by section 1395ii of Title 42.[3] But section 1395ff(b) provides that any individual dissatisfied with a determination as to the amount of Medicare benefits (including a determination that the amount is zero) shall be entitled to judicial review of the Secretary's final decision as is provided in section 405(g), which is the waiver provision. Section 1395ff(b)(2) then qualifies the waiver by stating that judicial review shall not be available if the amount in controversy is less than $1000. All of section 1395ff is thus subsidiary to section 405(h)'s retention of sovereign immunity "except as herein provided." Judicial review is provided and limited in sections 1395ff(b)(1) and (2). Given the ruling of *Bowen v. City of New York,* therefore, it is clear that sections 1395ff(b)(1) and (2) waive sovereign immunity as to claims of $1000 and up and expressly assert sovereign immunity as to claims under $1000.[4] That means Congress has asserted sovereign immunity as to Bartlett's claim, and the only question before us is whether Congress may constitutionally do so. There seems no doubt Congress may.

Once it is recognized that sovereign immunity is present, a solid body of doctrine comes into play. Whenever Congress gives its consent to suit, that consent, being "a relinquishment of sovereign immuni-

---

**1.** 42 U.S.C. § 405(g) (1982) provides in part:
 Any individual, after any final decision of the Secretary ..., irrespective of the amount in controversy, may obtain a review of such decision by a civil action ... [that] shall be brought in the district court of the United States....

**2.** 42 U.S.C. § 405(h) (1982) provides:
 The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of title 28 to recover on any claim arising under this subchapter.

**3.** 42 U.S.C. 1395ii (1982) provides:
 The provisions of sections 406 and 416(j) of this title, and of subsections (a), (d), (e), (f), (h), (i), (j), (k), and (*l*) of section 405 of this title, shall also apply with respect to this subchapter to the same extent as they are applicable with respect to subchapter II of this chapter.

**4.** If, for some reason, one did not read § 405(h) as an assertion of sovereign immunity, that would mean that the Supreme Court in *Bowen v. City of New York* read § 405(g) as a waiver of a sovereign immunity that exists as to benefit claims independently of § 405(h). This would not alter the conclusion in the text, for the sovereign immunity as to benefit claims under the Social Security Act would certainly apply to benefit claims under the Medicare Act. The claims are of identical types and, moreover, the judicial review provisions of the two statutes are integrated.

ty, must be strictly interpreted." *United States v. Sherwood*, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941). Moreover, speaking of the Court of Claims' inability to grant a declaratory judgment, the Supreme Court has held to be "settled propositions" that "jurisdiction to grant relief depends wholly upon the extent to which the United States has waived its sovereign immunity to suit and that such a waiver cannot be implied but must be *unequivocally* expressed." *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969) (emphasis added). Here, by contrast, there is an unequivocal *assertion* of sovereign immunity.

These principles of sovereign immunity suffuse every aspect of the present case—from the issue of statutory construction to that of constitutional power—and lead to the conclusion that the district court was without jurisdiction to entertain Bartlett's suit.

### B.

There is no dispute that the judicial review provisions of the Medicare Act, taken on their face, explicitly deny to any and all courts jurisdiction to entertain Bartlett's claim. The statute's prohibitions of judicial review are flat, inflexible, and without even a trace of any exception for constitutional challenges to the denial of a claim. Sovereign immunity, as will be shown, pp. 724–29, *infra*, routinely bars suit on constitutional grounds even though Congress does not mention such grounds. Congress need not make explicit an intention to bar constitutional challenges because sovereign immunity reverses the burden. It is up to the plaintiff suing the government to show that Congress has unmistakably consented to suit based upon the Constitution. Given

the language of section 1395ff(b)(2), it is difficult to know how review of Bartlett's claim could more clearly be barred.

Bartlett has found nothing—and I think the majority has found nothing—in the legislative history of section 1395ff that even hints at, much less unequivocally provides, any exception for or consent to constitutional challenges to the statute's explicit requirement of a jurisdictional minimum. Bartlett is undoubtedly correct in pointing out that the legislative history suggests Congress restricted Medicare benefit appeals to avoid overloading the courts with "trivial matters." *See Bowen v. Michigan Academy of Family Physicians*, — U.S. —, 106 S.Ct. 2133, 2138, 90 L.Ed.2d 623 (1986) (quoting Congressional Record). (The legislative history of the Medicare Act's judicial review provisions, which addresses all the Act's provisions collectively, is summarized in *Michigan Academy*, 106 S.Ct. at 2138–39, 2141 n. 10, and *United States v. Erika, Inc.*, 456 U.S. 201, 208–10 & nn. 11–13, 102 S.Ct. 1650, 1654–55 & nn. 11–13, 72 L.Ed.2d 12 (1982).) Recognition of this congressional purpose does not aid Bartlett. Neither in the statutory language nor in the legislative history did Congress single out constitutional challenges for special treatment. While, in one sense, even a $286 claim may not be a "trivial matter" when based on a first amendment challenge, Congress defined "trivial" in dollar terms rather than in terms of legal importance.[5]

Bartlett stresses that constitutional challenges that fall short of the $1000 threshold are likely to be few and therefore fall outside of Congress' purpose to avoid judicial "overload." But there is no indication that Congress intended courts to carve out for review categories of claims under $1000

---

**5.** The majority also attempts to by-pass the amount in controversy requirement by relying upon the Medicare Act's exhaustion requirement. Maj. op. at 701. But exhaustion doctrine is completely irrelevant to this question of statutory interpretation. The issue is not whether this court can find any basis in a remotely analogous doctrine to rationalize the decision to exercise its power of review; the issue is simply whether in writing this statute Congress explicitly withheld that power in cases like

this one. Moreover, the majority forgets that if Bartlett's claim were for $86 rather than $286, the same statutory provision would bar *both* administrative *and* judicial review of her $86 claim, 42 U.S.C. § 1395ff(b)(2) (1982) (no hearing available for claims under $100), which shows even more directly that the majority's reference to the exhaustion requirement is entirely irrelevant to a proper interpretation of this statute.

that would not, of themselves, result in a great many cases. Instead, Congress placed together all claims, however different in nature, that involved less than $1000. Moreover, it is obvious that acceptance of Bartlett's argument guarantees that the number of constitutional challenges will increase. Many Medicare claimants seeking less than $1000 could plead constitutional challenges to the statute in order to obtain subject matter jurisdiction. Those constitutional claims might often be too "insubstantial" to support jurisdiction, *see Hagans v. Lavine*, 415 U.S. 528, 536–38, 94 S.Ct. 1372, 1378–79, 39 L.Ed.2d 577 (1974), but to determine substantially courts would be forced to examine the claims—thus contributing to a judicial overload Congress sought to avoid with its $1000 limit. *See Heckler v. Ringer*, 466 U.S. 602, 627, 104 S.Ct. 2013, 2028, 80 L.Ed.2d 622 (1982) (Although in "the best of all worlds, immediate judicial access" for plaintiffs perhaps is desirable, Congress in sections 405(g) and 405(h) "struck a different balance" between individual hardship cases and the system-wide "potential for overly casual or premature judicial intervention.").

The Supreme Court has recently analyzed an attempt at statutory construction designed to avoid a constitutional issue in a way that dictates the result here. *Commodity Futures Trading Comm'n v. Schor*, — U.S. ——, 106 S.Ct. 3245, 3252–55, 92 L.Ed.2d 675 (1986). *Schor* involved a claim that the jurisdictional statute of the Commodity Futures Trading Commission ("CFTC") unconstitutionally granted the CFTC power to adjudicate common law counterclaims in reparation proceedings. In order to avoid this constitutional challenge, the Court of Appeals for the District of Columbia Circuit "read into the [statute's] facially unqualified reference to counterclaim jurisdiction [, which speaks of 'all counterclaims,'] a distinction between counterclaims arising under the [Commodities] Act or CFTC regulations and all other counterclaims." *Id.* 106 S.Ct. at 3253. Similarly, to avoid the constitutional problem of non-reviewability, the majority here seeks to read into the Medicare Act's "facially unqualified" bar on claims below

$1000 a distinction between benefit claims involving a constitutional challenge and all other benefit claims.

This court in *Schor* found an exception in the statute because Congress had no "clearly expressed" or "explicit" intention to "give the CFTC constitutionally questionable jurisdiction." 106 S.Ct. at 3251. That is the technique today's majority uses. But the Supreme Court in *Schor* held that the statute meant what it said and emphatically rejected what it called the lower court's "manufacture." I quote *Schor* at some length because it seems to me dispositive of the question of statutory construction here.

The Court of Appeals was correct in its understanding that "[f]ederal statutes are to be so construed as to avoid serious doubt of their constitutionality." Where such "serious doubts" arise, a court should determine whether a construction of the statute is "fairly possible" by which the constitutional question can be avoided. It is equally true, however, that this canon of construction does not give a court the prerogative to ignore the legislative will in order to avoid constitutional adjudication; " '[a]lthough this court will often strain to construe legislation so as to save it against constitutional attack, it must not and will not carry this to the point of perverting the purpose of a statute ...' or judicially rewriting it."

. . . .

... While the court's reading permitted it to avoid a potential Article III problem, it did so only by doing violence to the [statute], for its distinction cannot fairly be drawn from the language or history of the [statute], nor reconciled with the congressional purposes motivating the creation of the [CFTC's jurisdiction].

. . . .

... The canon of construction that requires courts to avoid unnecessary constitutional adjudication did not empower the Court of Appeals to manufacture a restriction on the CFTC's jurisdiction that was nowhere contemplated by Congress and to reject plain evidence of con-

gressional intent because that intent was not specifically embodied in a statutory mandate.

*Id.* at 3252, 3253, 3255 (citations omitted). The Court therefore reached and decided the constitutional issue. The majority here, like the court of appeals in *Schor*, has rewritten a clear statute to manufacture an exception that is contradicted by the face of the Medicare statute and is nowhere contemplated in the legislative history. This circuit does again what *Schor* holds it may not.

All of these arguments—about Congress' rationale for enacting the statute, and whether a court may cut back plain statutory language because the rationale Congress expressed is not as broad as the statutory text—are, in any event, largely irrelevant. Not only is the text plain and supported by the legislative history but there is, as to claims like Bartlett's, not only no unequivocal waiver of sovereign immunity but no faintest hint of such a waiver.

## C.

The statutory analysis set out above is confirmed by a comparison of two Supreme Court decisions.

*Johnson v. Robison,* 415 U.S. 361, 94 S.Ct. 1160, 39 L.Ed.2d 389 (1974), involved a constitutional challenge by a conscientious objector, who had performed required alternative service, to a provision of the Veterans' Readjustment Benefits Act that made him ineligible for educational benefits. When the Administrator of Veterans' Affairs applied the statute to deny his claim, Robison brought suit in a federal district court, invoking various bases for jurisdiction, including federal question jurisdiction under 28 U.S.C. § 1331. The government contended that no judicial review could be had because 38 U.S.C. § 211(a) provided: "[T]he decisions of the Administrator on any question of law or fact under any law administered by the Veterans' Administration providing benefits ... shall be final and conclusive and no other official or any court of the United States shall have power or jurisdiction to

review any such decision...." The Supreme Court noted that a construction of the statute barring federal courts from deciding the constitutionality of the benefit legislation would "raise serious questions concerning the constitutionality of § 211(a)," so that the Court should determine whether a construction that would avoid that constitutional issue was "fairly possible." 415 U.S. at 366–67, 94 S.Ct. at 1165.

The *Robison* Court thought section 211(a) did not explicitly bar consideration of constitutional claims because what the section made nonreviewable were *decisions* of the Administrator *under* any law administered by the Veterans' Administration. Thus, the section applied to decisions made in the administration of a statute, but appellant Robison was challenging not a decision of that sort but rather a decision made by Congress. The questions of law presented arose under the Constitution, not under the statute. This construction was confirmed by administrative practice, since the agency did not consider constitutional challenges, and by legislative history, since Congress had shown no intent to bar judicial review of constitutional attacks upon the statute but had been concerned with avoiding burdening the courts and uniformity of decisions. The Court said that these problems did not arise in cases involving the constitutional validity of the statute. Thus, neither the statutory text nor the legislative history provided the necessary "clear and convincing" evidence of congressional intent to prevent access to judicial review in a case like *Robison.*

*Robison's* effect on Bartlett's claim is not entirely clear. The statute in the present case, 42 U.S.C. § 1395ff(b), bars "judicial review of the Secretary's final decision" as to the amount of benefits, including a decision that the amount should be zero, where the amount claimed is less than $1000. This statute does not contain the language about decisions "under" the statute that the Court found important in *Robison* as indicating a congressional desire to insulate only administrative decisions, not congressional decisions, from review.

Here all of the Secretary's "final decision[s]" are so insulated, and the Secretary has decided that the statute precludes reimbursement to Bartlett. On the other hand, here, as in *Robison*, it can be said that the decision challenged is really not the Secretary's but Congress' and the question of law arises under the Constitution; the Secretary had no authority to pass on the constitutional question; and the legislative history does not show an intent specifically to prohibit review of a constitutional challenge to the statute. If *Robison* stood alone, it might, perhaps, allow a finding of jurisdiction in the present case.

But *Robison* does not stand alone. It was significantly modified by *Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). In that case, a widow challenged the duration-of-relationship provisions of the Social Security Act under which the Secretary of the Department of Health, Education, and Welfare had denied her benefits. The Court rejected the argument accepted in *Robison*, saying that though the widow's claim arose under the Constitution, the claim also arose under the Social Security Act, and section 405(h) therefore applied. Moreover, unlike section 211(a), involved in *Robison*, section 405(h) is not limited to decisions of the Secretary but extends to any "action" seeking "to recover on any Social Security claim," whether judicial review is sought because of discretionary decisions of the Secretary or the Secretary's nondiscretionary application of statutory provisions alleged to be unconstitutional. Section 405(g) provides district court review of any final decision of the Secretary and, the Court held, a denial of benefits on the basis of a statute which is alleged to be unconstitutional is nonetheless a decision of the Secretary for review purposes. *Salfi*, 422 U.S. at 764, 95 S.Ct. at 2466.

*Salfi* thus modifies *Robison* in ways that undercut the jurisdiction asserted by Bartlett. *Salfi* teaches that Bartlett's claim, though it arises under the Constitution, also arises under the Medicare Act so that the limits of section 405(h) and section 1395ff(b) apply. The decision challenged, according to *Salfi*, is that of the Secretary, even though the Secretary is applying a provision enacted by Congress. *Salfi* cuts off the escape through statutory construction employed by *Robison* and, therefore, means that Bartlett must proceed only on the jurisdictional basis provided by section 1395ff(b). It is true that *Salfi* also distinguished *Robison* on the additional ground that the latter case "was expressly based, at least in part, on the fact that if § 211(a) reached constitutional challenges to statutory limitations, then absolutely no judicial consideration of the issue would be available. Not only would such a restriction have been extraordinary, such that 'clear and convincing' evidence would be required before we would ascribe such intent to Congress, ... but it would have raised a serious constitutional question of the validity of the statute as so construed." 422 U.S. at 762, 95 S.Ct. at 2465.[6]

---

6. Setting aside the doctrine of sovereign immunity, the significance this passage might have for the present case is not clear. It is true that, if the limits on judicial review are construed to apply to constitutional challenges to the statute, Bartlett can obtain no judicial review. On the other hand, it is not true that the constitutionality of the statutory provision in question can never receive judicial consideration. The challenge Bartlett wishes to make can be made by any claimant in the same position but with a claim of $1000 or more. *Robinson* said that serious questions of constitutionality would be raised if § 211(a) were construed so that it "bars federal courts from deciding the constitutionality of veterans' benefits legislation." In that case, if Robison could not bring the issue to the courts, nobody could. Similarly, as noted, *Salfi* identifies as extraordinary, requiring "clear and convincing" evidence of congressional intent, and also of dubious constitutionality a statutory limitation that would mean that "absolutely no judicial consideration of the issue would be available." These passages may mean that the Court was concerned that a constitutional issue not forever escape judicial review rather than that a particular claimant should obtain review. If so, this seems to be a distinction new to the law, and one, I am inclined to think, that reads too much into words not chosen with this issue in mind. Moreover, to say that Congress could not entirely remove a constitutional claim from judicial consideration in benefits legislation would be to rule upon the much larger question of Congress' power over jurisdiction as to all constitutional issues. See text at pp. 729–30, *infra*.

The upshot is that *Salfi* bars judicial review of Bartlett's claim [7] unless it can be said that *Salfi*, by distinguishing *Robison* as based, in part, upon the remark about constitutional difficulties, thereby read, and ratified, *Robison* as changing the law of sovereign immunity in constitutional challenges to benefits legislation. That would mean that the entire doctrine of sovereign immunity is cast into doubt whenever an action against the government is based on a constitutional ground. This subject is taken up at pp. 728–29, *infra*. It will be seen, in any event, that *Salfi* recognizes a distinction that strongly suggests the continuing vitality of sovereign immunity in this field. *See* pp. 722–23, *infra*.

## D.

The majority finds relevant the general "presumption that Congress intends judicial review of administrative action," *Michigan Academy*, 106 S.Ct. at 2135. But that presumption has no place in this litigation. In the first place, the presumption of review appears to be rooted in "the ordinar[ ]y presum[ption] that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command." *Michigan Academy*, 106 S.Ct. at 2141. *See, e.g., id.* at 2136 (quoting Chief Justice Marshall and the legislative history of the Administrative Procedure Act on congressional use of the courts to control the Executive); *Leedom v. Kyne*, 358 U.S. 184, 190, 79 S.Ct. 180, 184, 3 L.Ed.2d 210 (1958) (Court "cannot lightly infer that Congress does not intend judicial protection of rights it confers against agency action taken in excess of delegated powers"). The presumption so explained is inapplicable in this case, where we are asked not to exercise judicial review of illegal executive action as a delegate of Congress, but to review legislative action of Congress itself. Unlike the Executive, Congress, as discussed below, has both a power to regulate the jurisdiction of federal courts and a power to withhold consent to suit in any court against the United States, powers which militate against a presumption favoring judicial review. The Supreme Court has expressly recognized that the elements composing the integrated structure of jurisdictional limitations governing Bartlett's claim are a limited consent to suit, *i.e.*, a limited waiver of sovereign immunity. *Bowen v. City of New York*, —— U.S. ——, 106 S.Ct. 2022, 2029, 90 L.Ed.2d 462 (1986) (constitutional and statutory challenge to Social Security procedures) ("We have no difficulty agreeing with [the] statement" that the 60–day statute of limitations in 42 U.S.C. § 405(g) "is a condition on *the waiver of sovereign immunity* and thus must be *strictly* construed" (emphasis added)). With any sovereign consent to suit, the proper presumption is that legislative "consent, since it is a relinquishment of a sovereign immunity, must be *strictly* interpreted," *United*

---

**7.** Two other cases require mention. In *Heckler v. Ringer*, 466 U.S. 602, 104 S.Ct. 2013, 80 L.Ed.2d 6222 (1984), Medicare claimants mounted constitutional and statutory challenges to the policy of the Secretary of Health and Human Services to deny reimbursement for a particular surgical procedure. The Court denied review because the claimants had not presented their claims to the Secretary. One litigant, Ringer, alleged that he could not do so because he could not afford the surgery unless reimbursement were guaranteed. The Court's ruling thus meant that Ringer could never obtain judicial consideration of his challenge. The Court said, however, that "whatever constitutional claims respondents assert are clearly too insubstantial to support subject-matter jurisdiction." 466 U.S. at 609 n. 4, 104 S.Ct. at 2018 n. 4. Though this was said with respect to claims for benefits under Part B of the Act, the constitutional arguments advanced were apparently the same as those made with respect to Part A claims, with which the opinion dealt. Thus, Ringer was not denied review of any serious constitutional claim, and the decision is of no assistance here.

In *Bowen v. Michigan Academy of Family Physicians*, —— U.S. ——, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), physicians brought suit claiming illegal and unconstitutional discriminatory treatment by the Secretary in his regulations governing allowable payments for Medicare Part B services; the Court found that § 405(h) did not bar their suit. Unlike Salfi or Bartlett, however, the Michigan Academy physicians did not contest a denial of a claim to benefits, nor did they seek the payment of a claim to benefits. Their claim, therefore, did not "arise under" the Medicare Act and § 405(h) did not restrict jurisdiction.

States v. Sherwood, 312 U.S. 584, 590, 61 S.Ct. 767, 771, 85 L.Ed. 1058 (1941) (emphasis added), and "cannot be implied but must be *unequivocally* expressed," *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1503, 23 L.Ed.2d 52 (1969), (emphasis added). Since, therefore, the Medicare jurisdictional provisions at issue here are a limited waiver of sovereign immunity, interpretation of those statutes must begin with an initial presumption *against* jurisdiction over Bartlett's claim.

Even if otherwise there could be any doubt on this point, the Supreme Court has provided specific guidance on the relation between sovereign immunity and presumptions like that favoring judicial review. In *Lehman v. Nakshian,* 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981), plaintiff claimed that it would be unconstitutional to deprive him of a jury trial in his suit against the United States under the Age Discrimination in Employment Act. The Court viewed the question as whether the government had conditioned the statute's waiver of immunity from suit on the absence of a jury trial. Plaintiff countered "that the strong presumption against the waiver of sovereign immunity has no relevance to the question of a [constitutional] right to trial by jury." 453 U.S. at 162 n. 9, 101 S.Ct. at 2702 n. 9. The Court responded:

> [I]t is clear that the doctrine of sovereign immunity and its attendant presumptions must inform the Court's decision in this case. The reason that the Seventh Amendment presumption in favor of jury trials does not apply in actions at law against the United States is that the United States is immune from suit, and the Seventh Amendment right to a jury trial, therefore, never existed with respect to a suit against the United States. Since there is no generally applicable jury trial right that attaches when the United States consents to suit, the accepted principles of sovereign immunity require that a jury trial right be clearly provided in the legislation creating the cause of action.

*Id.*

If the Supreme Court found that the seventh amendment's constitutional "presumption" did not affect its reading of a waiver of immunity, surely the presumption of judicial review does not affect the assertion of sovereign immunity. Yet the majority concludes that the *non*-constitutional presumption favoring review of agency action defeats Congress' reservation of sovereign immunity from Bartlett's claim. Even if that presumption were relevant to congressional action (which it probably is not), and even if that presumption were a constitutional doctrine (which it certainly is not), the majority's conclusion would remain an unsupportable contradiction of the general principles of the law of sovereign immunity and the Supreme Court's clear direction in *Nakshian.*

Finally, even if all these difficulties could be overcome, the presumption favoring review of administrative action is defeated if Congress' specific intent to the contrary is evident in the statutory language. *Block v. Community Nutrition Institute,* 467 U.S. 340, 349, 104 S.Ct. 2450, 2455, 81 L.Ed.2d 270 (1984). As has been shown, Congress' intent to bar all judicial review of Medicare Part A claims for less than $1000 could hardly be more clearly stated.

II.

A.

This case presents difficulties only because the Supreme Court appears to have said inconsistent things about benefits legislation that withholds judicial review of claims such as Bartlett's. On the one hand, the Court in *Bowen v. City of New York,* in which a constitutional claim was made, characterized statutory provisions indistinguishable from the provisions involved here as a waiver of sovereign immunity. That necessarily means that the United States could not have been sued if there had been no waiver. In cases such as *United States v. Mottaz,* —— U.S. ——, 106 S.Ct. 2224, 2229, 90 L.Ed.2d 841 (1986), moreover, the Court continues to adhere to the rule, even where a constitutional claim is asserted, that "[w]hen the United States consents to be sued, the terms of its waiver

of sovereign immunity define the extent of the court's jurisdiction." If we take these statements seriously, as we must, and if there were nothing to the contrary in the case law, then it would be obvious that the district court had no jurisdiction to entertain Bartlett's suit.[8] On the other hand, this clear rule may have been cast into doubt by the Court's remark in *Robison* that a construction of a statute that "bars federal courts from deciding the constitutionality of veterans' benefits legislation ... would, of course, raise serious questions concerning the constitutionality" of the statute. 415 U.S. at 366, 94 S.Ct. at 165. Though the government drew the doctrine of sovereign immunity to the Court's attention, *Robison* said nothing on the subject and did not mention the cases cited on the point.

This situation leaves lower courts in a quandry. *Robison*'s statement about questions of constitutionality must be taken as seriously intended, and yet it is not easy to accept the result of doing so. Should *Robison*'s statement be taken as a silent overturning of the doctrine of sovereign immunity for all constitutional challenges to benefits legislation? If so, much more would seem logically to follow. Benefits claims constitute the category of cases in which sovereign immunity is most readily upheld. *See infra,* pp. 720–24. Should *Robison*, therefore, be read to eliminate sovereign immunity for all constitutional claims against both federal and state legislation and executive action? These conclusions, though startling, would seem to follow logically. Lower courts, however, do not usually infer silent overruling when the Supreme Court gives no explicit indication that it has addressed an issue and that such overruling is intended. I think it safer for lower court judges to continue to respect established doctrine, particularly when that doctrine is as old and solidly rooted as sovereign immunity. In addition, the cases cited by the *Robison* Court for its aside about constitutionality do not address at all the subject of sovereign immunity.

Under these circumstances, the implication of a momentous yet tacit change in the law seems much too tenuous to be acted upon.

To substantiate the assertion that a bar to a constitutional challenge to benefits legislation would "raise serious questions concerning the constitutionality" of that bar, the *Robison* opinion appended a footnote consisting of case citations intended, apparently, to suggest the nature of the constitutional issue. That footnote, in its entirety, said simply:

> Compare *Ex parte McCardle*, 7 Wall. 506 [19 L.Ed. 264] (1869); *Sheldon v. Sill*, 8 How. 441 [12 L.Ed. 1147] (1850), with *Martin v. Hunter's Lessee*, 1 Wheat. 304 [4 L.Ed. 97] (1816); *St. Joseph Stock Yards Co. v. United States*, 298 U.S. 38, 84 [56 S.Ct. 720, 740, 80 L.Ed. 1033] (1936) (Brandeis, J., concurring). See Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362 (1953) [*reprinted in* P. Bator, P. Mishkin, D. Shapiro & H. Wechsler, *Hart & Wechsler's The Federal Courts and the Federal System* 330–60 (2d ed. 1973) [hereafter *Hart & Wechsler* ]].

415 U.S. at 366 n. 8, 94 S.Ct. at 1165 n. 8.

*Robison*, it is to be stressed, merely stated that there was a serious question of constitutionality. It did not purport to answer the question. In the light of other Supreme Court decisions, I think it may also be said, with respect, that *Robison* raised the question in a context in which it does not belong. The citations in the *Robison* footnote have to do with the much-debated question of the scope of Congress' power to remove the jurisdiction of inferior federal courts and of the Supreme Court to hear constitutional issues in any and all contexts. That is a far broader and more profound issue than any presented here. Unless *Robison* is to be taken as doing so, the Supreme Court had never suggested, so far as I am aware, that there might be a constitutional difficulty in a statute that merely invoked sovereign immunity with

---

8. The Secretary has not argued sovereign immunity to this court, but since Congress has asserted sovereign immunity in the statute we construe, and since that doctrine determines our jurisdiction, this court must itself raise the question.

respect to suits challenging the constitutionality of a statutory denial of government benefits.

The cases cited in *Robison*'s footnote are of a different nature altogether. *Sheldon v. Sill* involved a suit on a bond and a mortgage. The Court upheld congressional removal of diversity jurisdiction, a jurisdiction authorized in article III of the Constitution, in cases where there would have been no diversity of citizenship prior to an assignment of such documents. The Court stated that the power to remove the jurisdiction of the lower federal courts arises by necessary implication from the fact that Congress created those courts, although, of course, it was under no constitutional duty to do so: "[H]aving a right to prescribe, Congress may withhold from any court of its creation jurisdiction of any of the enumerated controversies [listed in article III of the Constitution]. Courts created by statute can have no jurisdiction but such as the statute confers." 49 U.S. (8 How.) 441, 448, 12 L.Ed. 1147 (1850). *Ex parte McCardle* held that Congress' repeal of a statute giving appellate jurisdiction to the Supreme Court in cases involving writs of habeas corpus effectively ended the ability of the Court to decide such a case then pending before it. The meaning of *McCardle* is still debated: there may or may not be a suggestion in the *McCardle* opinion itself that the Court did not concede an unlimited power in Congress to remove its appellate jurisdiction over entire categories of constitutional issues. *See* 74 U.S. (7 Wall.) 506, 515, 19 L.Ed. 264 (1869). In *Hunter's Lessee*, the Court asserted jurisdiction to review judgments of the highest state courts where an issue of federal law (there a treaty of the United States) was involved. The Court reasoned that Congress was under a constitutional duty to vest the entire judicial power specified in article III somewhere in the federal court system, which would mean that no class of cases may be removed entirely from federal jurisdiction. *See* 14 U.S. (1 Wheat.) 304, 330–33, 4 L.Ed. 97 (1816). This suggestion has not been accepted in later cases. *St. Joseph Stock Yards* affirmed a three-judge district court's judgment sustaining a rate

order of the Secretary of Agriculture under the Packers and Stockyards Act. A question was raised as to the weight courts should give the Secretary's findings. Justice Brandeis' concurring opinion stated that a person asserting a right is entitled to "the independent judgment of a court on the ultimate question of constitutionality." 298 U.S. 38, 84, 56 S.Ct. 720, 740, 80 L.Ed. 1033 (1936). The Hart *Dialectic* is an erudite and sophisticated exploration of the complexities of these issues.

These cases, which seem to look in different directions, raise the issue of Congress' power, and in particular its power under article III, section 2, clause 2 of the Constitution to make exceptions to the Supreme Court's jurisdiction, to remove constitutional issues in cases of all descriptions from the control of the federal courts. Bartlett's suit does not provide an appropriate occasion to enter upon an investigation of that hotly debated and surpassingly important question. It is nothing less than the question of the ultimate control of constitutional issues as between Congress and the Supreme Court. We need not, and, therefore, should not, address that issue, much less pretend to resolve it, because this case presents a problem that has long been recognized as being of a different order.

The cases cited in the *Robison* footnote were enforcement actions. That is, they involved either attempts by private parties to enforce legal obligations against other private parties (*Sheldon v. Sill* and *Martin v. Hunter's Lessee*) or attempts by government to enforce law against private parties (*Ex parte McCardle* and *St. Joseph Stock Yards Co. v. United States*). Whatever may ultimately be decided about Congress' power to remove jurisdiction over constitutional issues in such coercive enforcement actions, Bartlett presents a claim that has always been treated as different in kind, one which may be barred, even as to constitutional issues, by the doctrine of sovereign immunity. By contrast, the doctrine of sovereign immunity has no application whatever to a government enforcement action and has never been thought to have any.

Bartlett is seeking a benefit from the government, not resisting a government or private enforcement action. There is a line of Supreme Court decisions that permits denial of jurisdiction in cases of the former type, whatever the rule may be as to those of the latter variety. Drawing upon case law, Professor Hart's *Dialectic*, cited in the *Robison* footnote, concluded that congressional withdrawal of jurisdiction is least troublesome and questionable in "the cases of plaintiffs complaining about governmental decisions which do not involve the direct coercion of private persons." *Hart & Wechsler* at 346. The group of cases he indicated

> includes problems with respect to plaintiffs who are *neither* (a) trying to avoid becoming defendants, or (b) complaining about a governmental decision concerning a judicially enforceable duty of another private person, or (c) complaining about extrajudicial governmental coercion of themselves. For example, a plaintiff seeking review of a government contracting officer's decision which he had agreed in the contract should be final. *United States v. Moorman*, 338 U.S. 457 [70 S.Ct. 288, 94 L.Ed. 256] (1950). *Or a plaintiff seeking some statutory benefit from the government.*

*Hart & Wechsler* at 346–47 (emphasis added). This last category is the one into which Bartlett falls. Her claim to Medicare Part A benefits addresses neither present nor future governmental coercion against her nor governmental interference with the legal duty of a private person running in her favor. It is significant that Professor Hart coupled the category that encompasses benefit claims with the category represented by *Moorman*, for the Supreme Court there held that the plaintiff did not have access to the courts.

Professor Davis has come to a similar conclusion: "Upholding unreviewability of questions of law, jurisdiction, and procedure is easiest in the batch of cases involving denial of government bounties or benefits...." 4 K. Davis, *Administrative Law Treatise* § 28.18, at 98 (1st ed. 1958). Davis goes on to say that this rationale is unhelpful in perhaps two-thirds of the cases denying judicial review but, judging by the cases he cited, evidently meant that review could be denied in more categories of cases than those involving benefit claims. He then made a distinction very like Professor Hart's:

> Just as one may readily subscribe to the idea that review may be denied of the award of government gratuities or bounties, perhaps a court can more easily deny review of a withholding of administrative assistance from those who are beneficiaries of government programs than it can deny review of administrative enforcement of obligations upon those who are subjected to the disadvantage of government programs.

*Id.* § 28.19, at 103. *See also id.* at 104.

Professors Hart's and Davis's categorization accurately reflect the line drawn by the Supreme Court for many years. It has always been true that the United States could not be sued without its consent. This has nothing to do with the question of congressional power to remove the jurisdiction of federal courts when enforcement powers are brought to bear. Sovereign immunity has always been accepted by the Supreme Court. See, for example, *California v. Arizona*, 440 U.S. 59, 63, 65, 99 S.Ct. 919, 922, 923, 59 L.Ed.2d 144 (1979), involving California's suit to quiet title against Arizona and the United States ("It is clear, of course, that Congress could refuse to waive the Nation's sovereign immunity in all cases or only in some cases but in all courts. Either action would bind this court even in the exercise of its original jurisdiction," a jurisdiction given by the Constitution and not subject to the congressional Regulations and Exceptions power.).[9]

---

**9.** Both the congressional power to regulate federal court jurisdiction and the doctrine of sovereign immunity are rooted in the Constitution, though the latter is not expressly found there. The Supreme Court has held that the immunity of the United States from suit except upon its consent is implicit in the provision of article III, section 2, that the judicial power of the United States extends to "Controversies to which the United States shall be a Party." *Monaco v. Mississippi*, 292 U.S. 313, 321, 54 S.Ct. 745, 747, 78 L.Ed. 1282 (1934); *Williams v. United States,*

The leading Supreme Court decision involving immunity from suit for a statutory benefit is *Lynch v. United States*, 292 U.S. 571, 54 S.Ct. 840, 78 L.Ed.2d 1434 (1934). In each of the two cases there involved, the plaintiff was the beneficiary under an insurance policy issued during World War I pursuant to the War Risk Insurance Act. A later statute abrogated the outstanding insurance contracts. Plaintiffs claimed that the latter statute deprived them of property without due process of law in violation of the fifth amendment. Justice Brandeis, writing for a unanimous Court, agreed that the contracts were property protected by the due process clause of the fifth amendment and that Congress lacked power to abrogate the obligations of the United States. Nevertheless, "[t]he rule that the United States may not be sued without its consent is all embracing." *Id.* at 581, 54 S.Ct. at 844.

Although consent to sue was thus given when the policy issued, Congress retained power to withdraw the consent at any time.... *The sovereign's immunity from suit* exists whatever the character of the proceeding or the source of the right sought to be enforced. It *applies alike to causes of action arising under acts of Congress ... and to those arising from some violation of rights con-*

*ferred upon the citizen by the Constitution, Schillinger v. United States*, 155 U.S. 163, 166, 168 [15 S.Ct. 85, 86, 39 L.Ed. 108 (1894) ] ...

... When the United States creates rights in individuals against itself, it is under no obligation to provide a remedy through the courts, *United States v. Babcock*, 250 U.S. 328, 331 [39 S.Ct. 464, 465, 63 L.Ed. 1011 (1919) ]. It may limit the individual to administrative remedies. *Tutun v. United States*, 270 U.S. 568, 576 [46 S.Ct. 425, 426, 70 L.Ed. 738 (1926) ].

292 U.S. at 581–82, 54 S.Ct. at 844 (emphasis added). Though the Court held that Congress had intended to abrogate the contracts but not to withdraw the remedy of suit, Justice Brandeis' analysis of its power to do so even in the face of a constitutional claim has been repeatedly relied upon by courts since.[10] As the Supreme Court said in *Maricopa County v. Valley National Bank of Phoenix*, 318 U.S. 357, 362, 63 S.Ct. 587, 589, 87 L.Ed. 834 (1943), "the power to withdraw the privilege of suing the United States or its instrumentalities knows no limitations. *Lynch v. United States*, 292 U.S. 571, 581–82, 54 S.Ct. 840, 844, and cases cited." [11]

The Supreme Court has arguably not supplied an altogether satisfactory ratio-

289 U.S. 553, 572–73, 53 S.Ct. 751, 757, 77 L.Ed. 1372 (1933).

**10.** The majority seeks to employ *Lynch* to uphold its rewriting of the Medicare Act. Maj. op. at 708. The very quotation the majority offers demonstrates the fallacy in its argument. Justice Brandeis based his conclusion that Congress had consented to suit on the fact that the statute at issue contained "no separate provision ... dealing with the remedy" apart from the underlying legal right, *Lynch*, 292 U.S. at 586, 54 S.Ct. at 847, which enabled him to reach the issue of congressional intent. The Medicare Act sections before this court, in contrast, are nothing but a set of "separate provision[s] ... dealing with the remedy." *Lynch* thus undermines the majority's position.

**11.** The author of *Maricopa County* was Justice Douglas, who, dissenting in *Glidden Co. v. Zdanok*, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), objected to the fact that Justice Harlan, the author of the majority opinion, cited *Ex parte McCardle* with approval. *McCardle*, as

noted, accepted the power of Congress to eliminate the Court's jurisdiction to decide an appeal from a denial of habeas corpus. Justice Douglas said: "There is a serious question whether the *McCardle* case could command a majority view today." 370 U.S. at 605 n. 11, 82 S.Ct. at 1501 n. 11. The contrast between his remarks in *Maricopa County* and in *Glidden* suggests that Justice Douglas did not think that withdrawing consent to be sued for a government benefit raised constitutional problems but that removal of the Court's jurisdiction to entertain a petition for habeas corpus did—the distinction Professor Hart found in the case law.

The majority suggests that my reliance on sovereign immunity to decide this case "has effectively decided the precise constitutional issue," *i.e.,* the *McCardle* issue, that I claim to avoid deciding. Maj. op. at 704. In making this mistaken suggestion, the majority fails to comprehend the difference between a claim to Medicare benefits and a prisoner's writ of habeas corpus—a difference Justice Douglas understood perfectly well, and a difference the law has always recognized.

nale for the ability of the United States to withhold its consent to suit on a statutory benefit. The doctrine has its origins in English legal history, perhaps, it has been said, in a misunderstanding of that history. Today, it may possibly rest in part upon the practical necessities of the administrative-welfare state. *Salfi* made clear that, for reasons of administrative necessity, constitutional rules apply differently, or may not apply at all, to benefit programs. The widow there contended that the duration-of-relationship requirement for Social Security benefits was intended to ensure that "benefits should be awarded only on the basis of genuine marital relationships." 422 U.S. at 784, 95 S.Ct. at 2476. She argued that the due process clause of the fifth amendment required an individualized determination of the genuineness of the relationship and prohibited a conclusive presumption that marriages of less than six months' duration before the death of a spouse had been entered into for the purpose of obtaining benefits. The Court, however, upheld the legislative presumption:

> The Constitution does not preclude such policy choices as a price for conducting programs for the distribution of social insurance benefits. Cf. *Geduldig v. Aiello*, 417 U.S. [484], at 496 [94 S.Ct. 2485, 2491, 41 L.Ed.2d 256 (1974)]. Unlike criminal prosecutions, or the custody proceedings at issue in *Stanley v. Illinois*, [405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972)], such programs do not involve affirmative Government action which seriously curtails important liberties cognizable under the Constitution.

422 U.S. at 785, 95 S.Ct. at 2476. It is, of course, utterly clear that, when government takes affirmative action against an individual, the kind of individualized determination denied Salfi would be required. The distinction the *Salfi* Court drew between affirmative government action and benefits under social insurance programs parallels, indeed seems identical to, the distinction the cases and commentators have made between government enforcement actions and suits for benefits.[12]

Much the same distinction determined the result in *Flemming v. Nestor*, 363 U.S. 603, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). Nestor, a claimant for Social Security old-age benefits, had been deported just after becoming eligible for those benefits for having previously been, as an alien in this country, a member of the Communist Party. The Court held that the statute's classification of such deportees as ineligible for benefits was sufficiently rational to pass due process scrutiny. More important for present purposes, Nestor's "most insistently pressed" constitutional objections to the termination of his benefits rested upon article I, § 9, cl. 3, article III, § 2, cl. 3, and the sixth amendment. 363 U.S. at 612–13, 80 S.Ct. at 1373–74. He complained, that is, that the statute punished him without a judicial trial, imposed punishment by legislative act and so constituted a bill of attainder, and punished for past conduct not unlawful when engaged in and so was an *ex post facto* law. These were substantive constitutional claims, like Bartlett's, not due process challenges to the rationality of classifications. Nevertheless, the Supreme

---

12. *See also Heckler v. Chaney*, 470 U.S. 821, 832, 105 S.Ct. 1649, 1656, 84 L.Ed.2d 714 (1985) (agency's refusal to enforce not subject to judicial review in part because agency's *"coercive power over an individual's liberty or property"* not implicated) (emphasis in original); *Ortwein v. Schwab*, 410 U.S. 656, 93 S.Ct. 1172, 35 L.Ed.2d 572 (1973) ($25 filing fee for appeal of state welfare benefit determination constitutional as applied to claimant unable to pay since initial administrative hearing provided and claimant's interest in increased welfare payments not a "fundamental interest"); *De Magno v. United States*, 636 F.2d 714, 725 (D.C.Cir. 1980) ("It is one thing for an agency to have the final say over whether an individual will contin-

ue to receive a gratuitous governmental benefit; it is quite another for it to assert a right to use the coercive power of the government to seize and convert to its own use an individual's property without any possibility of judicial review.") (dictum) (footnote omitted).

The analysis in the text, of course, is not meant to suggest that gross classifications in benefits legislation are never found unconstitutional. *See, e.g., Califano v. Westcott*, 443 U.S. 76, 99 S.Ct. 2655, 61 L.Ed.2d 382 (1979); *Califano v. Goldfarb*, 430 U.S. 199, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975).

Court refused to reach the substance of those claims because Nestor sought a governmental benefit, the denial of which could not be characterized as "punishment." *Id.* at 616–21, 80 S.Ct. at 1375–78.

The fact that constitutional challenges were deflected in *Salfi* and *Nestor* because they were made in claiming government benefits, rather than in defending enforcement actions, creates a fairly strong implication that judicial review of a constitutionally-based benefit claim may be denied by Congress. The analogies are close, and perhaps sufficient, but I need not rely entirely upon them because the cases to be discussed next demonstrate that the same distinction supports sovereign immunity as to benefit claims like Bartlett's.

## B.

The pivot of the majority's argument appears to be the proposition that, though the Supreme Court has enunciated the distinction between benefit claims and enforcement actions in cases such as *Lynch* and *Maricopa County*, the Court has never barred a constitutional challenge to a statute on grounds of sovereign immunity. This is said to be so at least where the bar would leave no judicial forum, federal or state, available to hear and decide the constitutional issue. This proposition, in either its broad or narrow version, is easily shown to be false.

On numerous occasions, a suit claiming governmental funds of a state or the United States, whose immunities from suit stem from different sources but for this purpose "present the same legal issues," *Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. 682, 708, 69 S.Ct. 1457, 1470, 93 L.Ed. 1628 (1949) (Frankfurter, J., dissenting), have been dismissed by the Supreme Court because the sovereign has failed to waive its immunity even though the suit incorporated a constitutional challenge and even though the result was that no judicial forum was available. Since the majority attempts to explain away the cases supporting this proposition with arguments either mistaken or immaterial, it is necessary to discuss some representative decisions.

In *United States v. Mottaz,* —— U.S. ——, 106 S.Ct. 2224, 90 L.Ed.2d 841 (1986), an American Indian claimed that a sale of alloted Indian lands by the United States was illegal, an unconstitutional taking and a violation of due process. *Id.* 106 S.Ct. at 2227. The Court held that under one jurisdictional statute, the General Allotment Act, 25 U.S.C. § 345 (1982), the United States had not waived its sovereign immunity from claims such as plaintiff's, 106 S.Ct. at 2232, while under the other pertinent jurisdictional statute, the Quiet Title Act, 28 U.S.C. §§ 1346(f), 2409a (1982) ("QTA"), Congress' waiver of immunity was conditioned on a statute of limitations that barred plaintiff's claims, 106 S.Ct. at 2230. Thus, although "[f]ederal law rightly provides Indians with a range of special protections," sovereign immunity barred plaintiff's constitutional claims. *Id.* at 2234. Indeed, in *Block v. North Dakota,* 461 U.S. 273, 103 S.Ct. 1811, 75 L.Ed.2d 840 (1983), when a state bringing a quiet-title action against the United States claimed that the QTA's statute of limitations, although a reservation of sovereign immunity, was unconstitutional as applied to lands vested by the Constitution in the states themselves, *id.* at 291, 103 S.Ct. at 1822, the Court stated that "[a] constitutional claim can become time-barred just as any other claim can," *id.* at 292, 103 S.Ct. at 1822. The Court held further that the QTA provided the sole jurisdictional basis to establish title to land against the United States. *Id.* at 286, 103 S.Ct. at 1819. Thus, despite its constitutional challenge, North Dakota was left without a judicial forum and with merely the "hope of inducing the United States to file its own quiet title suit," *id.* at 292, 103 S.Ct. at 1822.

*Lehman v. Nakshian,* 453 U.S. 156, 101 S.Ct. 2698, 69 L.Ed.2d 548 (1981), rejected plaintiff's claim to a jury trial in a suit against the federal government under the Age Discrimination in Employment Act. Plaintiff's claim rested on the right to jury trial set out in the seventh amendment. The Court relied on the long-settled proposition that in the absence of congressional consent sovereign immunity suspends an

individual's constitutional right to jury trial. 453 U.S. at 160, 101 S.Ct. at 2701. There was, of course, no other judicial forum available in which the plaintiff could obtain the jury trial provided by the seventh amendment.

*Mine Safety Appliances Co. v. Forrestal,* 326 U.S. 371, 66 S.Ct. 219, 90 L.Ed. 140 (1945), involved a claim by a contractor that the Renegotiation Act, a statute permitting the Secretary of the Navy to withhold payment to war contractors who made "excessive profits," was unconstitutional. Plaintiff contractor brought suit in district court to enjoin the government's withholding of payments owed to it, alleging that the effects of the challenged statutory scheme made it "impossible" for it to pursue the remedy provided by the Act in the Tax Court. 326 U.S. at 372, 66 S.Ct. at 220. The Supreme Court held that since "this is an indirect effort to collect a debt allegedly owed by the government in a proceeding to which the government has not consented," jurisdiction did not lie "even though the Renegotiation Act under which the Secretary proposed to act might be held unconstitutional." *Id.* at 375, 66 S.Ct. at 221. The Court's holding was not affected by plaintiff's argument that it was "impossible" for it to bring its challenge elsewhere.

In *Morrison v. Work,* 266 U.S. 481, 45 S.Ct. 149, 69 L.Ed. 394 (1925), an American Indian challenged the government's management of lands ceded to the United States by his Indian tribe, claiming in part that subsequent congressional legislation governing the lands' administration had "depriv[ed the Indians] of property in violation of the Constitution." *Id.* at 484, 45 S.Ct. at 151. Justice Brandeis, for a unanimous Court, stated that the constitutional claims were barred, "as Congress has not consented that it be sued." *Id.* at 486, 45 S.Ct. at 151. The Court was silent on whether any other forum was open to the plaintiff, but clearly the United States' immunity would bar suit in a state court. It should be noted that this opinion was by Justice Brandeis, who, the majority professes to believe, did not really mean the strong and unequivocal rule of sovereign immunity he laid down in *Lynch.*

*Murray v. Wilson Distilling Co.,* 213 U.S. 151, 29 S.Ct. 458, 53 L.Ed. 742 (1909), concerned a dispensary commission established by South Carolina statute for the purchase and resale of distilled liquors. Creditors of the commission sued in federal court, claiming that subsequent state legislation winding up the business of the commission was a violation of the federal Constitution's contracts, due process, and equal protection clauses, *id.* at 167, 29 S.Ct. at 462, insofar as it limited the creditors' claims against the commission. The Supreme Court held that suit was barred by the eleventh amendment and stated:

> The absence in the winding up act of a provision conferring authority to review in the ordinary courts of justice the action of the commission concerning claims, instead of supporting the contention that the State had abandoned all property right in the funds placed in the hands of the commission, tends to a contrary conclusion, since it at once suggests *the evident purpose of the State to confine the determination of the amount of its liability to claimants, to the officers or agents chosen by the State for that purpose.* And it is elementary that even if a State has consented to be sued in its own courts by one of its creditors, a right would not exist in such creditor to sue the State in a court of the United States. The situation, therefore, was not changed as a result of the subsequent act of February 24, 1908, giving the creditors of the State, whose claims might be adversely acted upon by the commission, the right to a review in the Supreme Court of the State.

*Id.* at 172–73, 29 S.Ct. at 465 (emphasis added) (citations omitted). This discussion, and especially the emphasized language, clearly shows that the United States Supreme Court was wholly untroubled by the prospect that sovereign immunity may bar a constitutional claim from review in any judicial forum whatsoever. This conclusion is buttressed by the settled rule in eleventh amendment cases that consideration of a state's waiver of sovereign immunity in its own courts and of its waiver in federal

courts must be wholly independent of each other. *E.g., Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985). That state sovereign immunity derives from the eleventh amendment does not distinguish these cases from Bartlett's since federal sovereign immunity also has a constitutional base, the third article of the Constitution. *See supra* note 9.

In *Schillinger v. United States,* 155 U.S. 163, 15 S.Ct. 85, 39 L.Ed. 108 (1894), cited by Justice Brandeis in the *Lynch* decision, plaintiff sued the United States in the Court of Claims, alleging that the government's wrongful use of plaintiff's patent, as a taking of property, was a claim "founded upon the Constitution of the United States" under the Tucker Act. The Supreme Court, stating that "Congress has an absolute discretion to specify the cases and contingencies in which the liability of the Government is submitted to the courts for judicial determination," *id.* at 166, 15 S.Ct. at 86, construed plaintiff's claim as a tort and held that as such it fell outside the consent given in the Tucker Act and was barred, even if it was founded upon the Constitution. *Id.* at 168, 15 S.Ct. at 86.

In *Pennoyer v. McConnaughy,* 140 U.S. 1, 11 S.Ct. 699, 35 L.Ed. 363 (1891), a purchaser of land from the state of Oregon sued state officials, challenging subsequent state legislation cancelling his sale agreement as a violation of the contracts clause of the federal Constitution. The Court found the suit not to be against the state and permitted plaintiff to seek injunctive relief against the defendants, since plaintiff sought simply to compel them not to act in accord with the allegedly unconstitutional legislation, and did not seek any payment of money or other affirmative relief. *Id.* at 18–19, 11 S.Ct. at 704. If the suit had been of the latter type, it could not have been maintained, for, as the Court said, "[t]he immunity of a State from suit is absolute and unqualified" under the eleventh amendment, "even though the sole object of such suit be to bring the State within the operation of the constitutional [impairment of contracts] provision." *Id.* at 9, 11 S.Ct. at 701.

Finally, among the many nineteenth-century cases that addressed constitutional challenges to failure to pay state bondholders are *Louisiana ex rel. New York Guaranty & Indemnity Co. v. Steele,* 134 U.S. 230, 10 S.Ct. 511, 33 L.Ed. 891 (1890), and the leading case on this point, *Louisiana v. Jumel,* 107 U.S. (17 Otto) 711, 2 S.Ct. 128, 27 L.Ed. 448 (1882). In *Steele,* the Supreme Court, on a writ of error from the Louisiana Supreme Court, held that sovereign immunity barred a suit in state court alleging that state repealing legislation was an unconstitutional impairment of contract. Since, as *Jumel* indicates, Louisiana also had not waived its eleventh amendment immunity, no judicial forum was available for Steele to bring his constitutional challenge. In *Jumel,* although the Court found that the Louisiana bond contracts at issue "unmistakably ... would be protected by the Constitution of the United States against impairment," 107 U.S. at 720, 2 S.Ct. at 135, the Court proceeded to state:

> The bonds and coupons which the parties to these suits hold have not been reduced to judgment, and *there is no way in which the State,* in its capacity as an organized political community, *can be brought before any court of the State, or of the United States, to answer a suit in the name of these holders* to obtain such a judgment. It was expressly decided by the Supreme Court of the State that such a suit could not be brought in the State courts, and under the Eleventh Amendment of the Constitution no State can be sued in the courts of the United States by a citizen of another State. *Neither was there when the bonds were issued, nor is there now, any statute or judicial decision giving the bondholders a remedy in the State courts or elsewhere,* either by *mandamus* or injunction, against the State in its political capacity, to compel it to do what it has agreed should be done, but which it refuses to do.

*Id.* (emphasis added) (citation omitted). *See generally Larson v. Domestic & Foreign Commerce Corp.,* 337 U.S. at 710 n. 2,

713–14, 69 S.Ct. at 1471 n. 2, 1473 (Frankfurter, J., dissenting) (collecting authorities).

In the *Larson* case, which the majority asserts overruled *sub silentio* the *Morrison v. Work* decision discussed above, maj. op. at 709–10, the Court referred to the established rule that:

> Of course, a suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally or beyond his statutory powers, if the relief requested can not be granted by merely ordering the cessation of the conduct complained of but will require … the disposition of unquestionably sovereign property.

337 U.S. at 691 n. 11, 69 S.Ct. at 1462 n. 11 (citation omitted). Nor did the dissent in *Larson* have any quarrel with this rule. *Id.* at 715, 69 S.Ct. at 1474 (referring to "interference with government property"). The doctrine unanimously endorsed by the members of the *Larson* Court, upholding sovereign immunity in the face of a constitutional challenge by a plaintiff claiming sovereign property, describes a genus of claims within which a claim to governmental benefits such as Bartlett's is a species. *See also Edelman v. Jordan,* 415 U.S. 651, 664–69, 94 S.Ct. 1347, 1356–58, 39 L.Ed.2d 662 (1974) (claim to payment of previously denied benefits barred by eleventh amendment despite constitutional challenge to state's administration of benefit program).

In none of these cases, whether applying the United States' sovereign immunity or that of a state under the eleventh amendment, did the Court concern itself with whether any other judicial forum was available for a constitutional claim, and, as just shown, in a number of these cases no such forum existed. The majority is simply wrong in asserting that the Supreme Court has never held that there was no judicial forum in which a constitutional challenge to a statute could be heard. The Supreme Court has done so repeatedly. The truth of the matter is the reverse of the majority's claim. No Supreme Court decision has ever denied sovereign immunity, in a case where it otherwise would apply, because a constitutional challenge to a statute was advanced.

Some of the cases just discussed may go beyond the limited thesis maintained here: that sovereign immunity bars a constitutional challenge to the denial of a governmental benefit unless Congress waives that immunity. Insofar as these cases address coercive governmental conduct, I take no position on whether they remain good law today. But surely these decisions by the Supreme Court, unless they have all somehow been silently overruled, which I find impossible to believe, demonstrate that the district court was not empowered to hear Bartlett's benefit claim even though it incorporates a constitutional challenge.

The existence of sovereign immunity in cases involving constitutional challenges to a statute is further supported by the undeniable existence of sovereign immunity when constitutional challenges are made to the actions of executive branch officials. *Larson,* of course, says that explicitly: "[A] suit may fail, as one against the sovereign, even if it is claimed that the officer being sued has acted unconstitutionally." 337 U.S. at 691 n. 11, 69 S.Ct. at 1462 n. 11. This is the reason that the constitutional tort created in *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), would support a damage action against the agents only and not against the United States. Justice Harlan's concurrence made this point explicit. 403 U.S. at 410, 91 S.Ct. at 2011. Congress understood the law in the same way and amended the Federal Tort Claims Act to waive sovereign immunity as to *Bivens* claims.[13] *See also Edelman v. Jordan,* 415

---

**13.** [A]fter the date of enactment of this [amendment to the Federal Tort Claims Act, 28 U.S.C. § 2680(h) (1982)], innocent individuals who are subjected to raids [like that in *Bivens*] will have a cause of action against the individual Federal agents and the Federal Government.

Furthermore, this provision should be viewed as a counterpart to the *Bivens* case and its progeny [*sic*], *in that it waives the defense of sovereign immunity* so as to make the Government independently liable in damages for the same type of conduct that is alleged to have

U.S. 651, 664–69, 94 S.Ct. 1347, 1356–58, 39 L.Ed.2d 662 (1974) (eleventh amendment bars damage remedy based on constitutional and statutory challenge to state administration of benefit program). Recent decisions of this court have also found that sovereign immunity bars constitutional challenges to executive action. *Hohri v. United States*, 782 F.2d 227, 244–45 (D.C. Cir.1986) (sovereign immunity bars constitutional challenge seeking damages for executive internment of Japanese during World War II); *Morris v. Washington Metropolitan Area Transit Authority*, 781 F.2d 218 (D.C.Cir.1986) (extending sovereign immunities of both state and federal governments to the Washington Metropolitan Area Transit Authority to bar suit alleging that plaintiff's discharge as a Transit Police officer violated the Constitution).

The significance of these cases is clear. It is a more serious matter to bar constitutional claims against the government based on the actions of an executive officer than it is to bar such a claim based on the asserted unconstitutionality of an act of Congress. This, no doubt, is the reason that there is a presumption of judicial review as to the former but not the latter. *See supra* pp. 717–18. There are thousands of executive officers capable of inflicting unconstitutional injury but who are many tiers down the executive branch hierarchy. Their actions often do not reflect the judgment of anyone who is directly democratically accountable. By contrast, an act of Congress is the deliberate decision of the members of the two Houses of Congress which must be approved by the President or passed by supermajorities in Congress over the President's veto. Since sovereign immunity protects the government from damage claims because of the unconstitutional actions of obscure executive officials, it would seem, *a fortiori*, that it may bar claims based on the alleged unconstitutionality of a statute.

To take *Robison*'s brief statement about constitutional difficulties in barring a constitutional challenge to a benefits statute as, *sub silentio*, removing the doctrine of sovereign immunity from this area would thus produce sweeping and revolutionary results. It would mean, for example, that the Supreme Court's statement in *Bowen v. City of New York* that section 405(g), the provision allowing judicial review there, which is the same provision that governs appeals under the Medicare Act here, is a waiver of sovereign immunity, a statement made twelve years after *Robison*, must be regarded as erroneous in light of the earlier dictum. It would mean that the distinction between benefit claims and resistance to enforcement actions laid down in cases such as *Lynch* and *Maricopa County*, and recognized in the Hart *Dialectic* as well as in the Davis treatise, has been silently obliterated. It should mean that *Salfi* and *Nestor*, to the degree they rely upon the same distinction, are at least cast into doubt. It should mean, for the reasons just given, that the government may no longer claim sovereign immunity against damage actions based on the unconstitutional conduct of its officers. If sovereign immunity is abandoned as to constitutionally-based benefit claims, it would seem impossible to support immunity anywhere. The Tucker Act's waiver of immunity as to constitutional claims would be made superfluous. These upheavals in established doctrine are too much to draw from a remark in *Robison*. I think it safer for an inferior court to proceed on the premise that the law of sovereign immunity remains what it always has been and that it

occurred in *Bivens* (and for which that case imposes liability upon the individual Government officials involved).

S.Rep. No. 588, 93d Cong., 1st Sess. 3 (1973) (emphasis added), *quoted in Carlson v. Green*, 446 U.S. 14, 20, 100 S.Ct. 1468, 1472, 64 L.Ed.2d 15 (1980). The Court in approvingly quoting this language thus acknowledged again that although a *Bivens* plaintiff brings a claim based directly on the Constitution, the United States is under no obligation to waive its sovereign immunity from that claim (even though the individual official may be unavailable or judgment-proof). *See also* S.Rep. No. 588, *supra*, at 2–3 ("As a general principle under present law, if a Federal agent violates someone's constitutional rights … there is no remedy against the Federal Government. This ancient doctrine—sovereign immunity—stands as a bar.").

therefore deprives the district court of jurisdiction over Bartlett's suit.

### III.

A word should be said about the majority opinion. The majority reads the jurisdictional statute involved here as containing an unstated exception for constitutional challenges to the Medicare Act. I have sufficiently explained why this construction of the statute is not "fairly possible," as the Supreme Court states that a construction must be if it is employed to avoid deciding a constitutional issue. Having purchased the right to avoid the constitutional issue at an unacceptably high price in the deformation of the statute, however, the majority then unaccountably casts its purchase away by going on to decide the constitutional issue *Robison* avoided. Resolution of that question—the power of Congress to remove jurisdiction over constitutional issues in any and all types of cases—is utterly unnecessary under either the majority's rationale or my own.

Despite the majority's purported resolution of the issue of Congress' plenary power over jurisdiction, the problem posed by *Ex parte McCardle*, I express no opinion on that subject other than to note that it is far more complex than the majority's cursory disposition of it would suggest. Scholars are sharply divided on the subject and the literature is voluminous. Among the articles that conclude Congress has some degree of power to remove jurisdiction to hear constitutional defenses in enforcement cases are: Anderson, *The Power of Congress to Limit the Appellate Jurisdiction of the Supreme Court*, 1981 Det.C. L.Rev. 753; Graglia, *The Power of Con-*

gress *to Limit Supreme Court Jurisdiction*, 7 Harv.J.L. & Pub.Pol'y 23 (1984); Van Alstyne, *A Critical Guide to Ex Parte McCardle*, 15 Ariz.L.Rev. 229 (1973); Wechsler, *The Courts and the Constitution*, 65 Colum.L.Rev. 1001 (1965). Among those reaching generally the opposite conclusion are: Ratner, *Congressional Power over the Appellate Jurisdiction of the Supreme Court*, 109 U.Pa.L.Rev. 157 (1960); Rotunda, *Congressional Power to Restrict the Jurisdiction of the Lower Federal Courts and the Problem of School Busing*, 64 Geo.L.J. 839 (1976); Sager, *The Supreme Court, 1980 Term—Foreword: Constitutional Limitations on Congress' Authority to Regulate the Jurisdiction of the Federal Courts*, 95 Harv.L.Rev. 17 (1981).[14] It seems to me rash, to put it no higher, to offer a quick answer to this profound question in a case that does not require or, given the majority's statutory construction, even touch upon it.[15]

It may be that the doctrine of sovereign immunity will change in the way the majority desires; it may be that the remark in *Robison* about the constitutional difficulties that would be presented if a benefits statute denied review of its own constitutionality presages a radical transformation of what had seemed settled doctrine. As Justice Frankfurter said in dissent in *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 709, 69 S.Ct. 1457, 1470, 93 L.Ed. 1628 (1949):

The course of decisions concerning sovereign immunity is a good illustration of the conflicting considerations that often struggle for mastery in the judicial process, at least implicitly. In varying de-

---

**14.** In order to realize just how complex the issue is and how enormous the literature has become, see Gunther, *Congressional Power to Curtail Federal Court Jurisdiction: An Opinionated Guide to the Ongoing Debate*, 36 Stan.L.Rev. 895, 896 n. 3 (1984).

**15.** The majority may be moved to state a position on this subject because of its expressed concern that application of the doctrine of sovereign immunity might permit abhorrent welfare legislation. The truth is, however, that constitutional doctrines cannot be framed to

guard against every hypothetical evil. Much must be left to the wisdom and integrity of elected representatives. Were it otherwise, courts would long ago have had to abandon not only sovereign immunity but a variety of doctrines of justiciability, such as standing, political question, and the requirement of a case or controversy, that regularly operate to keep courts from constitutional issues. That sovereign immunity does so is not, of itself, sufficient ground to jettison the doctrine.

grees, at different times, the momentum of the historic doctrine is arrested or deflected by an unexpressed feeling that governmental immunity runs counter to prevailing notions of reason and justice. Legal concepts are then found available to give effect to this feeling....

Perhaps that is beginning to happen with respect to sovereign immunity in this field.

The implications of such a development should be recognized, however, before the next step is taken. It must be remembered that here Congress has not merely failed to articulate a waiver of sovereign immunity, it has affirmatively stated that there shall be no judicial review of the Secretary's denial of claims under $1000. To rule that this denial of review is unconstitutional is to decide the question of ultimate power that has been debated at least since *McCardle,* for if Congress may not prevent review of claims for government benefits, it certainly may not take the more drastic action of barring constitutional challenges to a statute by a defendant against whom the statute is sought to be enforced. If a step so momentous is to be taken, it should not be taken by an inferior court, particularly in a case where the court majority's statutory construction makes the step superfluous. If, on the other hand, the concept of sovereign immunity retains enough vitality to bar a claim for benefits, a decision to that effect has no implications as to congressional power to remove constitutional jurisdiction in enforcement actions.

The division between the majority and myself reflects a discontinuity in the law. *Robison*'s remark about constitutional difficulties simply cannot be reconciled with *Bowen v. City of New York*'s recognition that the judicial review provisions in question involve sovereign immunity, which the Court continues to honor. For the reasons given, I think it best to conclude, pending further clarification from the Supreme Court, that sovereign immunity denied the district court jurisdiction to entertain Bartlett's claim.

*I dissent.*